FEDERATED MANAGEMENT COMPANY et al., Appellants and Cross–Appellees,

v.

COOPERS & LYBRAND et al.; Fleet Bank, N.A., Appellee and Cross–Appellant.

[Cite as *Fed. Mgt. Co. v. Coopers & Lybrand* (2000), 137 Ohio App.3d 366.]

Court of Appeals of Ohio,
Tenth District, Franklin County.

No. 99AP–856.

Decided April 4, 2000.

368

372

*Roetzel & Andress, Gerald L. Draper* and *Margaret R. Carmany; Beus, Gilbert & Morrill, P.L.L.C.,* and *Leo R. Beus,* for appellants and cross-appellees.

*Hahn, Loeser & Parks, L.L.P., Alan S. Kopit, Steven A. Goldfarb, Kathleen B. Havener,* and *James E. Morgan,* for appellee and cross-appellant Fleet Bank, N.A.

TYACK, Judge.

On January 24, 1997, Federated Management Company, Federated Research Corporation, Federated Advisers, Federated Investment Counseling (collectively referred to as "Federated"), Oaktree Capital Management, L.L.C. ("Oaktree"), TCW Funds Management, Inc., TCW Asset Management Company, Trust Company of the West (collectively referred to as "TCW"), W.R. Huff Asset Management Co., L.L.C. ("W.R.Huff"), and numerous other trustees filed a complaint in the Franklin County Court of Common Pleas against Coopers & Lybrand, a general partnership; Coopers & Lybrand, L.L.P. (collectively referred to as "Coopers & Lybrand"); Donaldson, Lufkin & Jenrette Securities Corporation ("DL & J"), NatWest Capital Markets Limited ("NW Markets"); and certain individual defendants. Federated, Oaktree, TCW, and W.R. Huff are investment advisers, investment managers, and/or attorneys-in-fact who filed suit on behalf of certain trustees an/or beneficial owners of twelve percent Senior Subordinated Notes ("Notes"). The Notes were issued by Mid–American Waste Systems, Inc. ("MAW"), an integrated solid waste management company and a publicly traded company. On May 17, 1994, MAW issued the Notes in the aggregate principal amount of $175 million ("Note Offering") pursuant to a prospectus of the same date. The plaintiffs, on behalf of their clients, purchased some of the Notes.

As to the original defendants, the plaintiffs made the following averments. Coopers & Lybrand audited MAW's financial statements in relevant years and rendered consulting services to MAW. DL & J and NW Markets acted as lead underwriters in the issuance of the Notes and as MAW's financial advisers. The individual defendants included certain executives of MAW. The plaintiffs averred that each defendant knew or disregarded that certain practices, state-

ments, and omissions would materially affect and artificially inflate the financial condition of MAW and induce the plaintiffs to purchase the Notes, which were worth significantly less than represented.

The plaintiffs asserted the following claims against each defendant: violation of R.C. 1707.41, violation of R.C. 1707.43, common-law fraud, aiding and abetting common-law fraud, negligent misrepresentation, breach of fiduciary duty/acting in concert, negligence, violations of Sections 11 and 15 of the Securities Act of 1933, violations of Section 12(2) of the Securities Act of 1933, and violations of Section 17 of the Securities Act of 1933. In addition, the plaintiffs asserted a claim for breach of contract against NW Markets and DL & J.

On April 14, 1997, the plaintiffs filed a first amended compliant, adding as plaintiff Credit Suisse First Boston Corp.

On November 17, 1997, the plaintiffs filed a second amended complaint, adding defendants National Westminster Bank, PLC ("NW PLC") and Fleet Bank of New York, N.A. ("Fleet Bank"). The plaintiffs averred that NW PLC acted as a financial adviser and underwriter as to the Notes. The plaintiffs further averred that Fleet Bank was the successor by merger to NatWest Bank, N.A., who was the successor to National Westminster Bank USA ("NatWest USA"). NatWest USA was the agent bank for a $75 million line of credit to MAW that was a condition to the issuance of the Notes. The plaintiffs averred that NatWest USA participated directly or indirectly in placing and offering the Notes and in the underwriting of such Notes. All of the same original claims for relief were asserted against Fleet Bank.[1]

On January 30, 1998, NatWest USA filed a motion to dismiss pursuant to Civ. R. 12(B)(2), (4), (5), and (6) asserting, in part, that the plaintiffs had not stated any claim upon which relief could be granted. On May 15, 1998, the trial court filed a decision and entry granting, in part, and denying, in part, NatWest USA's motion to dismiss. The trial court dismissed the plaintiffs' claims for aiding and abetting common-law fraud, breach of fiduciary duty/acting in concert, violations of the Securities Act of 1933 and breach of contract. Therefore, the remaining claims against NatWest USA were violation of R.C. 1707.41 and 1707.43, common-law fraud, negligence, and negligent misrepresentation.

On June 15, 1998, NatWest USA filed its answer to the second amended complaint and a counterclaim for indemnification/contribution. On July 14, 1998, the plaintiffs filed a motion to dismiss NatWest USA's counterclaim, which was denied on January 29, 1999.

---

1. Throughout the course of the litigation below and here, the parties have referred to Fleet Bank as NatWest USA. For the sake of consistency, this court will also refer to Fleet Bank as "NatWest USA."

On October 22, 1998, the plaintiffs filed a motion for leave to file a third amended complaint, seeking to add a new claim against the defendants under R.C. 1707.44(G). The trial court denied plaintiffs' motion for leave to file a third amended complaint, stating that the motion was untimely and that leave to amend the complaint would prejudice the defendants.

On November 25, 1998, NatWest USA (and the other defendants) filed a series of motions for summary judgment on various grounds. One of NatWest USA's motions requested summary judgment on the merits of the claims against it and one requested summary judgment on statute of limitations grounds. The plaintiffs filed memoranda contra, and NatWest USA replied. The defendants also filed a joint motion for summary judgment, seeking judgment on all the claims on the basis that the prospectus was not materially misleading. In addition, the defendants filed a joint motion for summary judgment as to any claims involving plaintiffs' after-market purchases.

On April 7, 1999, the defendants filed a motion *in limine* seeking to preclude plaintiffs from asserting that the losses on their investment were greater than the losses asserted in their proof of claim in bankruptcy court.[2]

On April 15, 1999, the trial court denied NatWest USA's motion for summary judgment on statute of limitations grounds. On April 19, 1999, the trial court filed a decision granting NatWest USA's motion for summary judgment on the merits as to the remaining claims against NatWest USA. On April 21, 1999, the trial court filed a decision granting in part and denying in part the defendants' motion for summary judgment regarding alleged material misstatements in the prospectus. On this same date, the trial court filed a decision granting in part and denying in part the defendants' joint motion with regard to the plaintiffs' after-market purchases.

On June 1, 1999, Coopers & Lybrand filed a stipulation dismissing the action against Coopers & Lybrand with prejudice as a result of a settlement. On June 4, 1999, a notice of voluntary dismissal pursuant to Civ.R. 41(A) was filed, which dismissed the individual defendants. On June 25, 1999, a stipulation dismissing DL & J, NW Markets, and NW PLC was filed.

On June 25, 1999, a judgment entry was journalized. In the entry, the trial court stated that the only claims remaining were NatWest USA's counterclaims against the plaintiffs. The trial court indicated that the counterclaims were moot as a result of the May 15, 1998 decision and entry regarding NatWest USA's

---

2. On January 21, 1997, MAW filed a Chapter 11 petition in the United States Bankruptcy Court for the District of Delaware after it missed two scheduled interest payments and defaulted on the Notes.

motion to dismiss and the April 19, 1999 decision and entry granting NatWest USA's motion for summary judgment on the merits.

The plaintiffs (hereinafter "appellants") have appealed to this court, assigning the following errors for our consideration:

"1. The trial court erred in its Decision and Entry of May 15, 1998, by dismissing Plaintiffs' claims for aiding and abetting common law fraud and for common law fraud, to the extent said claim was based on the doctrine of fraudulent concealment.

"2. The trial court erred in its Decision and Entry of April 19, 1999, by granting summary judgment in Fleet Bank, N.A.'s favor on Plaintiffs' claims under the Ohio Securities Act[,] for common law fraud, and for negligence and negligent misrepresentation.

"3. The trial court erred in overruling, by Decision and Entry filed October 30, 1998, Plaintiffs' Motion For Leave To File An Amended Complaint.

"4. The trial court erred in its Decision and Entry of May 4, 1999, by ruling that the Plaintiffs did not have standing to assert claims under the Ohio Securities Act.

"5. The trial court erred in its Decision and Entry of April 21, 1999, by ruling, as a matter of law, that the environmental compliance discussions in the Prospectus were not misleading to a reasonable investor.

"6. The trial court erred in its Decision and Entry filed April 21, 1999, by ruling that Plaintiffs could not reasonably rely on the Prospectus after May 17, 1995.

"7. The trial court erred in its order of May 10, 1999, by precluding Plaintiffs from seeking damages in excess of the amount of their claims in bankruptcy against Mid–America Waste Systems, Inc.

"8. The trial court erred in its Decision and Entry of January 29, 1999, by denying the Plaintiffs' motion to dismiss the counterclaims of Fleet Bank N.A."

NatWest USA (hereinafter "appellee") has filed a cross-appeal, assigning the following as error:

"1. The trial court erred in overruling defendant Fleet Bank, N.A.'s motion for summary judgment (statute of limitations).

"2. The contribution counterclaims of defendant Fleet Bank, N.A., which the trial court dismissed as moot, should be reinstated if the trial court's grant of judgment in favor of Fleet Bank, N.A. is reversed and remanded on any claim and on any ground."

By way of brief background, in the fall of 1993, MAW owed approximately $190 million on two outstanding credit facilities, both led by Provident Bank as agent. Appellee was owed approximately $17 million as part of such revolving bank debt. In October 1993, MAW defaulted on the credit facilities. MAW's management explored various restructuring plans. Appellee had met with MAW in an effort to expand its participation in MAW's credit needs. Appellee saw an opportunity to refer MAW to its investment banking affiliate, NW Markets, who could aid in MAW's capital restructuring plans. NW Markets could provide debt underwriting services to MAW should MAW's restructuring include a subordinated debt offering.

On December 30, 1993, MAW engaged NW Markets as its financial advisor and agent in connection with a proposed offering of subordinated debt and equity securities to be used primarily to refinance the existing debt. NW Markets was retained as the underwriter for the Note Offering, and NW Markets brought in DL & J to co-manage the underwriting. Coopers & Lybrand was brought in as MAW's outside accountants. A condition of the Note Offering was a $75 million credit facility ("New Credit Facility") which would be agented by appellee.

Due diligence was performed by appellee and the underwriters for the New Credit Facility and Note Offering, respectively. As part of its due diligence, appellee retained SCS Engineers ("SCS") to perform an environmental assessment of MAW. The results of the assessment included estimates for MAW's closure and postclosure costs. Such costs concerned the future costs necessary to close, cap, monitor, and maintain all of MAW's landfills.

On March 24, 1994, appellee provided MAW with a commitment letter. The letter acknowledged MAW's intention to issue at least $175 million of its senior subordinated notes and outlined the $75 million New Credit Facility, which was conditioned upon issuance of the Notes. Included in such commitment letter was a summary of the terms and conditions, which included as conditions precedent satisfaction with environmental matters and evidence of compliance with applicable environmental regulatory standards.

In May 1994, appellee received the results of the SCS environmental assessment. The assessment contained closure and postclosure cost estimates for MAW's operating landfills totaling $142,905,718. The prospectus contained MAW's 1993 financial statements in which MAW estimated its total closure and postclosure costs to be only $8,462,000. In early April/May 1994, the underwriters held a series of road shows consisting of meetings with prospective investors concerning the Note Offering.

On May 24, 1994, the Note Offering and New Credit Facility closed.

In February 1996, MAW missed an interest payment on the Notes and defaulted on the Notes. On January 21, 1997, MAW filed petitions for Chapter 11 bankruptcy relief. On January 24, 1997, the present suit ensued.

We address appellants' third assignment of error first. Appellants contend that the trial court erred in denying their motion for leave to file a third amended complaint. As indicated above, appellants had filed a second amended complaint on November 17, 1997. Appellants moved for leave to file a third amended complaint on October 22, 1998. For the reasons that follow, we find that the trial court did not abuse its discretion in denying appellants' motion for leave to file a third amended complaint.

Civ.R. 15(A) addresses amended pleadings, and the language therein favors a liberal policy with regard to amending a pleading beyond the time limit when amendment is automatically allowed. *Wilmington Steel Products, Inc. v. Cleveland Elec. Illum. Co.* (1991), 60 Ohio St.3d 120, 121–122, 573 N.E.2d 622, 623–625. While the rule allows for liberal amendment, motions should be refused if there is a showing of bad faith, undue delay, or undue prejudice to the opposing party. *Turner v. Cent. Local School Dist.* (1999), 85 Ohio St.3d 95, 99, 706 N.E.2d 1261, 1264. This court has stated that the primary consideration is actual prejudice to the opposing party because of the delay. *Schweizer v. Riverside Methodist Hosp.* (1996), 108 Ohio App.3d 539, 546, 671 N.E.2d 312, 316–317.

This court's role in reviewing the trial court's ruling on a motion for leave to amend is to determine whether the trial court's decision was an abuse of discretion, not whether it was the same decision this court might have made. *Wilmington Steel Products, Inc.*, at 122, 573 N.E.2d at 624–625. An abuse of discretion connotes more than an error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary or unconscionable. *Id.* In the case at bar, appellants contend that they should have been granted leave to amend because the motion was filed six months before trial, appellants would have needed no additional discovery on any element of the new claim, and the amendment would cause minimal disruption to the trial court's schedule. Appellee asserts that there was no abuse of discretion because an amendment would have been prejudicial.

Appellants point to the case *Hambleton v. R.G. Barry Corp.* (1984), 12 Ohio St.3d 179, 12 OBR 246, 465 N.E.2d 1298, in support of their contention. In *Hambleton,* the Supreme Court of Ohio found that an amendment requested five months prior to trial should have been allowed. *Id.* at 184, 12 OBR at 250–251, 465 N.E.2d at 1302–1303. Appellants' motion for leave to amend was filed approximately six months prior to the scheduled trial date. However, the amendment in *Hambleton* merely sought to include a specific demand for

$10,000,000 in damages; it did not add to or change the cause of action. *Id.* In addition, the Supreme Court noted that the failure to allow an amendment ran contrary to Civ.R. 54(C), which, at the time, stated that a demand for judgment for money limits the claimant to the sum claimed in the demand unless the claimant amends the demand not later than seven days before commencement of trial. *Id.* In the case at bar, the third amended complaint would have added new allegations and an entirely new claim. Thus, appellants' reliance upon *Hambleton* is flawed.

Here, the trial court's basis for denying leave was that the motion was untimely, and amendment would unfairly prejudice the defendants. As indicated above, the motion for leave to amend was filed on October 22, 1998. The trial court pointed out that the discovery cut-off was November 6, 1998, defendants' expert reports were due on November 16, 1998, the dispositive motion deadline was November 23, 1998, and the trial date was March 22, 1999, actually five months from the date of appellants' motion to amend. The trial court stated that allowing the new claim(s) would seriously prejudice the defendants' ability to meet all the deadlines, and the trial court was not inclined to extend those deadlines.

Appellants' third amended complaint sought to add an allegation that appellee violated the banking laws of the United States. Under Count 1 (violation of R.C. 1707.41), the third amended complaint added an allegation that appellee received profits or monies from sales of the Notes. Under Count 2 (violation of R.C. 1707.43), the third amended complaint substituted for the original allegations an allegation that the sales were made in violation of R.C. 1707.44(G) as the defendants (including appellee) knowingly engaged in acts such as aiding and abetting common-law fraud, violations of the Securities Act of 1933, violations of the Securities Exchange Act of 1934, violation of Section 1341 (frauds and swindles), Section 1343 (wire fraud), and Section 1344 (bank fraud), Title 18, U.S.Code, violation of Section 204A of the Investment Advisors Acts of 1940, violation of federal banking laws, including Section 21.11, Title 12, C.F.R., and violation of R.C. 1707.44(J).

At the October 30, 1998 hearing on the motion, defense counsel asserted that as to the new claim under R.C. 1707.44(G), the defendants had spent virtually no time preparing to defend on the issues appellants sought to inject into the case. Defense counsel pointed out that through the R.C. 1707.44(G) claim, appellants had pled ten new federal statutes and regulations (*i.e.*, defendants had violated R.C. 1707.44[G] by virtue of their violations of these other provisions of federal securities law). Defense counsel stated that defendants were not ready to defend against these claims and certainly not ready to file motions for summary judgment on them. There had been no discovery on the issue of bank fraud, and

counsel for appellee stated that they had conducted no discovery relating to the issues raised for the first time in the third amended complaint.

Given all of the above, defendants, including appellee, clearly would have been unduly prejudiced by the third amended complaint. Hence, the trial court did not abuse its discretion in denying appellants' motion for leave to file a third amended complaint. Accordingly, appellants' third assignment of error is overruled.

In their first assignment of error, appellants contend that the trial court erred in dismissing their claims for aiding and abetting common-law fraud and for common-law fraud, to the extent that the fraud claim was based on fraudulent concealment. We first address the dismissal of appellants' claim for aiding and abetting common-law fraud.

In the amended complaint, appellants asserted a claim for aiding and abetting common-law fraud. Specifically, appellants averred that the defendants committed fraud in connection with the Note Offering and that each defendant, including appellee, knew or should have known of the fraud perpetrated by the other defendants. Further, appellants averred that each defendant gave substantial assistance to the other defendants in committing fraud against appellants.

On January 30, 1998, appellee filed a motion to dismiss each claim set forth in the amended complaint. As to the claim for aiding and abetting common-law fraud, appellee pointed to the trial court's September 8, 1997 ruling on Coopers & Lybrand's motion to dismiss. In that ruling, the trial court dismissed the claim against Coopers & Lybrand for aiding and abetting common-law fraud on the basis that Ohio did not recognize such a claim. Appellee argued that such ruling would apply equally to the same claim asserted against it. On May 15, 1998, the trial court granted appellee's motion to dismiss the claim for aiding and abetting common-law fraud. The trial court referred to its earlier decision in favor of Coopers & Lybrand.

Appellee initially contends that appellants waved the right to assert error as to this issue. While appellants opposed Cooper & Lybrand's contention that Ohio did not recognize a cause of action for aiding and abetting fraud, appellants did not so oppose this same contention set forth in appellee's motion to dismiss. It is axiomatic that issues not presented for consideration before the trial court will not be considered by a court on appeal. *Shover v. Cordis Corp.* (1991), 61 Ohio St.3d 213, 220, 574 N.E.2d 457, 462–463, overruled on other grounds in *Collins v. Sotka* (1998), 81 Ohio St.3d 506, 692 N.E.2d 581, paragraph one of the syllabus. In not opposing appellee's motion to dismiss on this issue, appellants arguably waived their right to assert error in the trial court's decision on the issue. Appellants should have addressed the issue in their memorandum

contra appellee's motion to dismiss. The fact that the trial court had addressed the issue in a separate decision affecting a different defendant does not change this. Appellants still were obligated to raise their objection to appellee's argument if appellants wanted to preserve for appeal any error arising from such issue.

■ Assuming appellants did not waive this issue, we find that the trial court was correct in concluding that Ohio does not recognize a claim for aiding and abetting common-law fraud. Appellants cite *Burton v. DePew* (1988), 47 Ohio App.3d 107, 547 N.E.2d 995, *Kuhn v. Bader* (1951), 89 Ohio App. 203, 45 O.O. 455, 101 N.E.2d 322, and *LaCrone v. Ohio Bell Telephone Co.* (1961), 114 Ohio App. 299, 19 O.O.2d 236, 182 N.E.2d 15, in support of their assertion that Ohio recognizes liability on the part of those who assist or encourage another's tortious conduct. However, these cases do not support appellants' assertion that Ohio recognizes or should recognize a claim for aiding and abetting fraud.

For example, in *Burton,* the complaint alleged that the defendant caused the wrongful death of the decedents by aiding and abetting another defendant in the commission of a wrongful act. *Id.* at 108, 547 N.E.2d at 995–996. The court indicated that wrongful death was a statutory creation. The court did not recognize a claim for aiding and abetting wrongful death. Rather, the court found that the complaint stated a claim for wrongful death itself. *Id.* at 109, 547 N.E.2d at 996. In *LaCrone,* the court merely concluded that the complaint stated a claim against a telephone company for invasion of privacy when the company placed a tap on the plaintiff's telephone and thereby allowed unauthorized persons to listen to the plaintiff's conversations. The court held that the act itself of tapping the telephone could constitute invasion of privacy. Again, the court found that the telephone company could be liable for an act the company itself committed and not merely as an aider and abettor.

■ The cases cited by appellants stand more for the proposition that one is liable if one actually engages in conduct that is wrongful. Thus, one is not liable as an aider and abettor but as an active wrongdoer. The person would be liable under a claim for fraud—not as an aider and abettor of fraud. See *Klein v. Equitable Life Assur. Soc.* (1984), 17 Ohio App.3d 50, 53, 17 OBR 105, 107–108, 477 N.E.2d 1190, 1192–1193 (relief on the ground of fraud can be had only against those shown to have been parties thereto); *Fahey Banking Co. v. Adams* (1994), 98 Ohio App.3d 214, 218, 648 N.E.2d 68 70. Hence, this court believes that the case law indicates that one who engages in any way in fraudulent behavior is liable for fraud itself, not as an aider and abettor to fraud. Indeed, this court stopped short of acknowledging that a claim for aiding and abetting fraud was recognized in Ohio. See *Woodworth v. Huntington Natl. Bank* (Dec. 7, 1995), Franklin App. No. 95APE02–219, unreported, at 8, 1995 WL 723664; see, also,

*Andonian v. A.C. & S., Inc.* (1994), 97 Ohio App.3d 572, 574, 647 N.E.2d 190, 191–192

In summary, although appellants arguably waived the right to assert as error the trial court's conclusion that Ohio does not recognize a claim for aiding and abetting common-law fraud and the dismissal of the claim on that basis, this court finds that Ohio does not recognize such a claim for relief. To this extent, appellants' first assignment of error is overruled.

Turning to the latter part of appellants' first assignment of error, appellants contend that the trial court erred in dismissing their fraud claim to the extent the claim was based on fraudulent concealment. However, we do not address this issue in the context of a motion to dismiss. Rather, we address the issue in the context of summary judgment. Contrary to appellants' assertion, the trial court did not dismiss appellants' fraud claim or any part thereof. The trial court did find, in ruling on appellee's motion to dismiss, that a plaintiff may not maintain an action for fraudulent concealment absent a showing of a duty to disclose. The trial court noted that appellants had not alleged that a fiduciary or other similar relationship of trust and confidence existed between themselves and appellee, and the trial court concluded that such a relationship indeed did not exist. However, the trial court concluded that appellants could still maintain a claim for fraud as they had sufficiently alleged that appellee had made certain misrepresentations.

The trial court again addressed appellants' fraud arguments in ruling on appellee's motion for summary judgment. This discussion included a reiteration of the law as to fraudulent concealment. Again, the trial court concluded that appellants' claim in this regard failed to meet the duty-to-disclose prong. In making their argument on appeal, appellants point to evidence in support of their fraudulent concealment claim. Given this and the trial court's ruling on the issue in response to a motion for summary judgment, we address the issue in the context of summary judgment.

Summary judgment is appropriate when, construing the evidence most strongly in favor of the nonmoving party, (1) there is no genuine issue of material fact, (2) the moving party is entitled to judgment as a matter of law, and (3) reasonable minds can come to but one conclusion, that conclusion being adverse to the nonmoving party. *Zivich v. Mentor Soccer Club, Inc.* (1998), 82 Ohio St.3d 367, 369–370, 696 N.E.2d 201, 203–204, citing *Horton v. Harwick Chem. Corp.* (1995), 73 Ohio St.3d 679, 653 N.E.2d 1196, paragraph three of the syllabus. Our review of the appropriateness of summary judgment is *de novo*. See *Smiddy v. The Wedding Party, Inc.* (1987), 30 Ohio St.3d 35, 30 OBR 78, 506 N.E.2d 212. Appellants contend that appellee is liable for fraud, in part, because appellee concealed its knowledge of an environmental assessment performed by SCS and thereby ratified certain misrepresentations in the prospectus. Specifically, appel-

lants point to evidence that Kathy Weiss, one of appellee's officers who had responsibility over the MAW account, requested and received from SCS closure and postclosure cost estimates for MAW's landfills, which showed that the costs disclosed in MAW's financial statements were understated by over $130 million. However, Weiss told no one of this material information.

Appellee asserts that there is no duty on the part of a commercial lending institution to disclose information about its customers to third parties, and it had no duty to disclose any information to potential investors. Indeed, appellee points out that it had no relationship at all with any investor. Appellants contend that duty is not a requirement in a fraudulent concealment claim. However, appellants' claim is for fraud, and the Supreme Court of Ohio has set forth the elements of a fraud claim in *Burr v. Stark Cty. Bd. of Commrs.* (1986), 23 Ohio St.3d 69, 23 OBR 200, 491 N.E.2d 1101, paragraph two of the syllabus:

"(a) a representation or, *where there is a duty to disclose, concealment of a fact,*

"(b) which is material to the transaction at hand,

"(c) made falsely, with knowledge of its falsity, or with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred,

"(d) with the intent of misleading another into relying upon it,

"(e) justifiable reliance upon the representation or concealment, and

"(f) a resulting injury proximately caused by the reliance." (Emphasis added.)

As indicated in the holding above, a duty to disclose is a requirement if concealment of fact is alleged as a basis for fraud. Moreover, in *State v. Warner* (1990), 55 Ohio St.3d 31, 53, 564 N.E.2d 18, 39, the Supreme Court addressed the scope of the duty to disclose where fraud is alleged. The Supreme Court of Ohio cited *Chiarella v. United States* (1980), 445 U.S. 222, 100 S.Ct. 1108, 63 L.Ed.2d 348, wherein the United States Supreme Court discussed the possible situations where a duty to disclose arises. *Warner* at 53, 564 N.E.2d at 39. The *Chiarella* court explained that one who fails to disclose material information prior to the consummation of a transaction commits fraud only when he is under a duty to disclose, and the duty to disclose arises when one party has information that the other party is entitled to know because of a fiduciary or other similar relation of trust and confidence between them. *Warner* at 54, 564 N.E.2d at 39–40, quoting *Chiarella* at 228, 100 S.Ct. at 1114–1115, 63 L.Ed.2d at 356–357. See, also, *Schulman v. Wolske & Blue Co., L.P.A.* (1998), 125 Ohio App.3d 365, 372, 708 N.E.2d 753, 757–758, discretionary appeal not allowed in (1998), 81 Ohio St.3d 1526, 692 N.E.2d 1027 (in cases where the alleged misrepresentation is silence,

silence will constitute a misrepresentation only if the circumstances are such that the law recognizes a duty to speak).

The above cases illustrate that a duty to disclose arises primarily in a situation involving a fiduciary or other similar relationship of trust and confidence. A fiduciary relationship has been defined as a relationship in which special confidence and trust is reposed in the integrity and fidelity of another and there is a resulting position of superiority or influence, acquired by virtue of this special trust. *Ed Schory & Sons, Inc. v. Soc. Natl. Bank* (1996), 75 Ohio St.3d 433, 442, 662 N.E.2d 1074, 1081–1082 In the case at bar, no one has alleged that a fiduciary or other similar relationship of trust and confidence existed between appellants and appellee. Indeed, there was at the very least no direct relationship at all between these parties.

However, appellants contend that this case is akin to *Haddon View Investment Co. v. Coopers & Lybrand* (1982), 70 Ohio St.2d 154, 24 O.O.3d 268, 436 N.E.2d 212, syllabus, where the Supreme Court held:

"An accountant may be held liable by a third party for professional negligence when that third party is a member of a limited class whose reliance on the accountant's representation is specifically foreseen."

The Supreme Court indicated that cases had held that only those in privity with accountants could hold them liable for professional negligence, but a growing number of courts had declined to employ a strict privity rule to bar third parties from recovery. *Id.* at 155–156, 24 O.O.3d at 268–269, 436 N.E.2d at 213–214. The court noted that privity was not required to assert a fraud claim. *Id.* at 158, 24 O.O.3d at 270–271, 436 N.E.2d at 215. The Supreme Court stated that an accountant's duty to prepare reports using generally accepted accounting principles extends to any third person to whom the accountant understands the reports will be shown for business purposes. *Id.* at 157, 24 O.O.3d at 269–270, 436 N.E.2d at 214–215. In *Haddon View*, the third parties were limited partners who constituted a limited class of investors whose reliance on the accountant's certified audits was specifically foreseen by the accounting firm. *Id.*

Here, appellants are distinguishable from the limited partners in *Haddon View*. In discussing who could hold an accountant liable, the *Haddon View* court noted that the leading case on common-law liability had held that an accountant need not respond in negligence to those in the extensive and indeterminable investing public-at-large. *Id.* at 156, 24 O.O.3d at 269, 436 N.E.2d at 214. The *Haddon View* court noted that a subsequent court had distinguished the leading case by stating:

" 'Here, the services of the accountant were not extended to a faceless or unresolved class of persons, but rather to a known group possessed of vested

rights, marked by a definable limit and made up of certain components.' " *Id.* at 156, 24 O.O.3d at 269, 436 N.E.2d at 214, quoting *White v. Guarente* (1977), 43 N.Y.2d 356, 361–362, 401 N.Y.S.2d 474, 477–478, 372 N.E.2d 315, 318–319.

■ Appellants were not a known group possessed of vested rights and marked by a definable limit. Indeed, they were more akin to the extensive, faceless, and indeterminable investing public-at-large. Therefore, appellants' reliance on *Haddon View* is flawed. While privity is not required in a fraud claim, a duty to disclose is a prerequisite. There was no fiduciary relationship between appellants and appellee. Further, even if this court were to extend the principles set forth in *Haddon View* to a fraud claim, appellants have not shown that they were a group specifically known to appellee such that appellee owed them some sort of duty to disclose.

Given all of the above, this court finds that summary judgment was appropriate as to appellants' fraudulent concealment claim, as appellee owed appellants no duty to disclose.

In summary, appellants waived their right to assert error in the trial court's dismissal of the claim for aiding and abetting common-law fraud. Further, this court would be inclined to find that Ohio does not recognize a claim for aiding and abetting common-law fraud. Therefore, the trial court did not err in dismissing this claim. In addition, summary judgment in favor of appellee on appellants' fraud claim, to the extent the claim was based on fraudulent concealment, was appropriate. Accordingly, appellants' first assignment of error is overruled.

■ In their fourth assignment of error, appellants contend that the trial court erred in ruling that Ohio securities law does not apply to the sales at issue.[3] Appellee contends that Ohio's so-called blue sky law does not apply because neither the underwriters (NW Markets and DL & J) nor appellants were Ohio residents, and none of the sales or marketing of the notes occurred in Ohio.[4] Appellants assert that Ohio's blue sky law does apply because, among other things, the issuer of the Notes, MAW, was an Ohio-based company. For the reasons that follow, we find that appellants properly brought claims against appellee under Ohio blue sky laws.

---

3. The trial court addressed this issue in the context of a motion for summary judgment filed by other defendants. However, appellee did raise the issue of the applicability of Ohio securities law below and, therefore, this court will address the issue as it pertains to appellants' claims against appellee under R.C. 1707.41 and 1707.43.

4. The underwriters were headquartered in New York, and appellant's investment advisors were corporations located in New Jersey, California, and Pennsylvania.

Appellee cites *In re Revco Securities Litigation* (Dec. 12, 1991), N.D.Ohio, No. 89CV593, unreported, 1991 WL 353385, in support of its contention. In *Revco,* the district court dismissed a plaintiff's claim under R.C. 1707.41 on the basis that there was an insufficient nexus between the sale of the securities and Ohio. The plaintiff, a New York partnership, had asserted a claim against an underwriter incorporated in Delaware. The issuer of the securities was an Ohio company. In ruling that Ohio law was not applicable, the district court found that activities occurring in Ohio such as the compilation and dissemination of information contained in the registration statement and prospectus, accounting, auditing, legal work regarding the securities, the giving of financial advice, and assistance in the structuring of the merger did not directly concern the sale of the Revco securities to the plaintiff. The district court indicated that while Revco had significant business ties with Ohio, such contacts had little or no relationship to the sale of the securities.

Appellee also cites *Martin v. Steubner* (S.D.Ohio 1979), 485 F.Supp. 88, in support of its contention that Ohio law does not apply. In *Martin,* the plaintiff-purchaser, a resident of Ohio, asserted a claim under R.C. 1707.43. The purchaser averred that the defendant, a Minnesota corporation, sold a security in Ohio in violation of R.C. 1707.09, which requires that securities be registered in the state prior to being sold in the state. *Id.* at 98–99. The district court concluded that Ohio law was applicable despite the defendant's minimal contacts with Ohio. The defendant had no place of business in the state, the defendant never entered the state or conducted business in Ohio, and there was no telephone solicitation in Ohio. However, the purchaser lived in Ohio, and two letters and the unsigned subscription agreement were mailed from the out-of-state defendant to the Ohio purchaser. The district court found this sufficient to constitute a sale in Ohio when viewed with the state's interest in protecting its citizens from the sale of securities which have not first been subject to the state's investigative and evaluative processes. *Id.*

We disagree with the conclusion reached in *Revco.* In addition, we believe that despite the fact that appellants are out-of-state purchasers and that the underwriters were out-of-state sellers, appellants properly asserted claims against appellee under R.C. 1707.41 and 1707.43. Ohio blue sky law anti-fraud provisions must be liberally construed. *In re Columbus Skyline Securities, Inc.* (1996), 74 Ohio St.3d 495, 498, 660 N.E.2d 427, 429. R.C. 1707.41 states:

"[A]ny person who, by a * * * prospectus * * * offers any security for sale, or receives the profits accruing from such sale, is liable, to any person who purchased such security relying on such * * * prospectus * * * for the loss or damage sustained by such relying person by reason of the falsity of any material

statement contained therein or for the omission therefrom of material facts * * *."

R.C. 1707.43 states:

"Every sale or contract for sale made in violation of Chapter 1707. of the Revised Code, is voidable at the election of the purchaser. The person making such sale or contract for sale, and every person who has participated in or aided the seller in any way in making such sale or contract for sale, are jointly and severally liable to such purchaser, in an action at law in any court of competent jurisdiction * * *."

Essentially, appellants' claim under R.C. 1707.41 alleges that appellee contributed to the existence of false statements contained in the prospectus and that the prospectus and the information contained therein induced appellants to purchase the securities at issue. Under R.C. 1707.43, any person who participated in or aided the seller in any way in making a sale that violates R.C. 1707.41 is jointly and severally liable. If appellants' allegations with regard to appellee's role in the Note Offering are proven true, then appellee would be liable under the above provisions. The question is whether those provisions apply since neither the purchasers nor the underwriters were based in Ohio, and the marketing and solicitation of such notes did not take place in Ohio. Given the specific allegations against appellee that form the basis for claims under R.C. 1707.41 and 1707.43, we find that Ohio blue sky law is applicable.

This court believes that the ties to Ohio in this case are significant insofar as the wrongdoing alleged against appellee. First, the issuer of the notes, MAW, was an Ohio-based company with its headquarters and principal place of business located in Canal Winchester, Ohio. Therefore, by virtue of its relationship with MAW as MAW's bank, appellee had significant contacts with MAW in Ohio throughout the period leading up to the Note Offering. Accounting activities regarding MAW's financial situation (which undoubtedly related to the New Credit Facility and Note Offering) occurred in Ohio. Appellee met with MAW in Ohio regarding MAW's financial plans and expressed its interest in "playing a role" in MAW's plans. Appellee outlined to MAW its capabilities in the noncredit area through its affiliate, NW Markets. Appellee hired SCS to conduct an environmental assessment of MAW, which involved visiting Ohio, and that assessment forms the basis of the main claim against appellee. All of these activities led up to and/or were prerequisites to the actual Note Offering.

All of the above leads us to the conclusion that there was a sufficient connection with Ohio such that Ohio blue sky law is applicable to wrongdoing alleged here. Accordingly, appellants' fourth assignment of error is sustained.

In their second and fifth assignments of error, appellants assert that the trial court erred in granting summary judgment in favor of appellee on appellants' claims under R.C. 1707.41 and 1707.43 and for appellants' claims for fraud and negligence/negligent misrepresentation. Related to all of these claims is the trial court's granting of appellee's motion for summary judgment, which contended that the prospectus was not materially misleading. We will address appellants' claims under R.C. 1707.41 and 1707.43 first.

Appellants contend that summary judgment in favor of appellee on the R.C. 1707.41 claim was inappropriate because it is undisputed that appellee received profits accruing from the sale of securities. As indicated above, R.C. 1707.41 states:

"In addition to the other liabilities imposed by law any person who, by a written or printed circular, prospectus, or advertisement, offers any security for sale, *or receives the profits accruing from such sale,* is liable, to any person who purchased such security relying on such circular, prospectus, or advertisement, for the loss or damage sustained by such relying person by reason of the falsity of any material statement contained therein ·or for the omission therefrom of material facts * * *." (Emphasis added.)

Appellants contend that appellee received profits accruing from the sale of the notes in question because appellee received twenty percent of the underwriting fee received by NW Markets. Indeed, Alfred Bonfantini, vice president of appellee at the times in question, stated in an affidavit that for its referral of the MAW business opportunity to NW Markets, appellee received a "referral fee" from NW Markets in an amount equal to twenty percent of the financial advisory fees earned by NW PLC and a "referral fee" from NW Markets equal to twenty percent of the fees earned by NW Markets for underwriting the Note Offering. The question is whether these "fees" constitute "profits accruing from" the sale of securities as set forth in R.C. 1707.41. We conclude that in receiving such "fees," appellee profited from the sale of securities.

The "fees" received by appellee were based upon the proceeds the underwriter received from MAW. These proceeds gained by the underwriter were based directly on the Note Offering. Hence, appellee did profit from the sale of securities. Appellee's argument that the fees it received were akin to fees earned by attorneys and printers who worked for an underwriter is flawed. Attorneys who perform services for underwriters in connection with a securities offering would receive their fee regardless of whether the securities actually went up for sale. Here, appellee received its fees because the underwriter received its fees, and the underwriter received its fee (a fee that was directly based upon the price of the Notes) because the Note Offering actually occurred. Appellee received

profits accruing from the sale of securities, and the trial court erred in concluding otherwise.

R.C. 1707.41 also requires that there be a "falsity of any material statement" in the prospectus or an "omission therefrom of material facts." As to this issue, appellee filed a separate motion for summary judgment contending that all of appellants' remaining claims must fail because there were no material misrepresentations or omissions of material fact in the prospectus.

██ As to appellants' claim under R.C. 1707.41, appellants assert that the discussion in the prospectus relating to environmental regulations and the degree to which MAW's landfills complied with those regulations was misleading to appellants as reasonable investors. Specifically, appellants contend that the prospectus misrepresented that all landfills, including existing landfills, were required to meet design criteria set forth in federal Subtitle D of the Resource Conservation and Recovery Act (Section 258.1, Title 40, C.F.R.) and that the prospectus touted that MAW's existing landfills were in substantial compliance with such regulations. In fact, appellants contend, Subtitle D did not require that existing landfills meet such design criteria and, despite this, the prospectus stated that MAW had a competitive advantage over other operators, who would be required to make significant capital expenditures to upgrade their existing landfill facilities. Appellants contend that the above constitutes material misrepresentations because neither MAW nor its competitors were required to "upgrade" their existing landfills and, therefore, MAW had no such competitive advantage.

In ruling on appellee's motion for summary judgment regarding material misrepresentations in the prospectus, the trial court found that the prospectus adequately represented that not all landfills were subject to the Subtitle D regulations. This court has reviewed the prospectus and the regulations at issue. We find no material misrepresentations with regard to such regulations. Further, the prospectus does not contain misrepresentations with regard to MAW's compliance with such regulations. Accordingly, appellants' fifth assignment of error is overruled.

██ However, the allegations relating to the Subtitle D regulations were not the only misrepresentations upon which appellants base their R.C. 1707.41 claim. Appellants also contend that the prospectus contained material misrepresentations regarding MAW's closure and postclosure cost estimates for its landfills. Specifically, appellants contend that the prospectus greatly understated MAW's closure and postclosure costs. As to this issue, the trial court specifically found in its decision on appellee's motion for summary judgment as to material misrepresentations in the prospectus that reasonable minds could not come to but

one conclusion regarding the closure and postclosure cost estimates contained in the prospectus. However, and as indicated above, the trial court granted appellee's separate motion for summary judgment on the merits. In that decision, the trial court did not address the closure/postclosure cost issue in the context of appellants' R.C. 1707.41 claim. The trial court did not address this issue because the claim was disposed of on the ground appellee had not profited from the sale of securities. Hence, the trial court did not have to reach the issue of whether the statements regarding closure and postclosure cost estimates were material misrepresentations.

Appellee did not address the closure/postclosure cost issue in its motion for summary judgment on the merits presumably because it had addressed this issue in its separate motion for summary judgment relating to material misstatements in the prospectus. Instead, appellee argued that appellants' R.C. 1707.41 claim must fail because appellants waived it by electing the remedy of rescission under R.C. 1707.43, appellee was not a seller of MAW's notes, and appellee did not receive profits accruing from the sale of securities.

Because the trial court specifically found, as to the issue of closure and post-closure costs, that genuine issues of fact existed as to whether such statements constituted material misrepresentations, and given our conclusion that appellee received profits accruing from the sale of securities, summary judgment in favor of appellee on appellants' R.C. 1707.41 claim was inappropriate.

We now address appellants' claim under R.C. 1707.43. Appellants contend that the trial court erred in granting appellee summary judgment on the R.C. 1707.43 claim because appellee aided and participated in the Note Offering. R.C. 1707.43 states:

"Every sale or contract for sale made in violation of Chapter 1707. of the Revised Code, is voidable at the election of the purchaser. The person making such sale or contract for sale, *and every person who has participated in or aided the seller in any way in making such sale or contract for sale*, are jointly and severally liable to such purchaser, in an action at law in any court of competent jurisdiction * * * for the full amount paid by such purchaser * * * unless the court determines that the violation did not materially affect the protection contemplated by the violated provision." (Emphasis added.)

Appellants contend that appellee participated in or aided the seller(s) in making fraudulent sales by acting as MAW's financial advisor and in engaging in other conduct intended to induce appellants to invest. Appellee contends that its involvement with MAW's restructuring consisted only of participating in and agenting the $75 million New Credit Facility and that all of its conduct was that of an ordinary commercial bank. Appellee emphasizes that it was never engaged

by MAW as a "financial advisor"; rather, NW PLC was MAW's exclusive financial advisor, appellee did not initiate or conceive of the idea or structure of the Note Offering, and appellee did not participate in the underwriters' due diligence for the Note Offering.

Further, appellee asserts that any review by it of portions of the prospectus was solely for its benefit in relation to the New Credit Facility and was unrelated to the promotion of the Note Offering. In addition, in providing a commitment letter to MAW, appellee was not assisting in disseminating false or misleading information, nor did providing the letter, knowing it would be disclosed to investors, go beyond the normal and ordinary course of conduct of a commercial bank.

There is little case law interpreting R.C. 1707.43's language "participated in or aided the seller in any way." However, it is clear that this language is broad in scope given the phrase "in any way." In *Hild v. Woodcrest Assn.* (1977), 59 Ohio Misc. 13, 7 O.O.3d 195, 13 O.O.3d 91, 391 N.E.2d 1047, the Montgomery County Common Pleas Court addressed the pertinent language in R.C. 1707.43. In *Hild*, the complaint sought rescission of the sales of limited partnership shares pursuant to R.C. 1707.43. The accounting firm retained by the seller of the shares developed financial and investment information and prepared a memorandum for the purpose of attracting potential investors. The accounting firm also contacted its own clients, including the plaintiff, who were interested in making this type of investment.

The trial court stated that the language in R.C. 1707.43 and liability thereunder extended beyond the actual seller/issuer of the security and that courts had stressed the "in any way" language. *Id.*, citing *Crane v. Courtright* (1964), 2 Ohio App.2d 125, 31 O.O.2d 202, 206 N.E.2d 913; *Miller v. Griffith* (C.P.1961), 92 Ohio Law Abs. 488, 28 O.O.2d 278, 196 N.E.2d 154. The court indicated that in other states, "participating" and "aiding" had been interpreted as implying some activity in inducing the purchaser to invest. The trial court found that undoubtedly the accounting firm had participated in the sales to the plaintiff to an extent well within the liberal language of R.C. 1707.43. *Id.*

We agree with the *Hild* analysis insofar as it correctly states that the language in R.C. 1707.43 is liberal. However, contrary to appellee's contention, *Hild* did not adopt the other states' approach as the definitive test. Rather, the "inducement" test is but one factor in determining liability under R.C. 1707.43. R.C. 1707.43 does not require that a person induce a purchaser to invest in order to be held liable. Rather, the language is very broad, and participating in the sale or aiding the seller *in any way* is sufficient to form a basis for liability under R.C. 1707.43.

Again, *Hild* emphasized that R.C. 1707.43 extends liability beyond the actual seller/issuer of the security. In another case, it was held that although a different entity was responsible for soliciting and making the sale of stock, preparing a private placement memorandum, which was distributed to prospective investors, may subject one to liability under R.C. 1707.43. *Corporate Partners, L.P. v. Natl. Westminster Bank PLC* (1998), 126 Ohio App.3d 516, 524, 710 N.E.2d 1144, 1149–1150.

Appellee cites *Schlifke v. Seafirst Corp.* (C.A.7, 1989), 866 F.2d 935, in support of its contention that its activities did not implicate securities law. In *Schlifke,* a company sold limited partnership interests in a limited partnership, and such company obtained financing for the limited partnership from a bank. A term of the loan agreement was that borrowings by the limited partnership were to be secured by letters of credit from investors. The company's sales personnel were responsible for distributing documents and soliciting investors. The limited partnership defaulted on the loan, and the bank demanded payment of the letters of credit securing the loan.

The district court found, and the circuit court agreed, that nothing in the complaint demonstrated that the bank's participation in the limited partnership program amounted to anything more than a customary financial transaction. *Id.* at 939. The court concluded that the bank was not a "seller," as it had not actively participated in the solicitation of investors, had not participated in the preparation of the prospectus, had no contact with the company's sales personnel, and had not actively promoted the investment program. *Id.* at 940–941. However, the federal securities law provision at issue in *Schlifke* related to who was a seller and was not analogous to or as broadly worded as R.C. 1707.43.

As to the circuit court's discussion on aider-and-abettor liability under the federal securities statute, the federal case law interpreting the statute requires that the alleged aider and abettor commit one of the wrongful acts with the same degree of scienter that is required for primary liability. *Id.* at 947. Again, the statute at issue in the case at bar, R.C. 1707.43, is very broad and requires only a determination that a person participated or aided "in any way." This same analysis applies to the circuit court's discussion of the "controlling person" theory of liability. *Id.* at 948–949. R.C. 1707.43 does not require control over the seller; rather, it merely requires aiding or participating "in any way."

Given the above, appellee's reliance on *Schlifke* in support of its argument as to liability under R.C. 1707.43 is not well taken. It must be emphasized that R.C. 1707.43 uses very broad language, and, in addition to this, the securities laws are to be liberally construed. *In re Columbus Skyline Securities,* 74 Ohio St.3d 495, 660 N.E.2d 427. In addition, this issue is before us in the context of summary judgment, and the evidence must be construed most strongly in favor of appel-

lants. After reviewing the evidence, this court concludes that reasonable minds could come to different conclusions as to whether appellee participated in or aided the seller(s) in any way in making sales that violated R.C. 1707.41.

Evidence that supports our conclusion includes, but is not limited to, the following. One of the sellers of the Notes was NW Markets, an affiliate of appellee. This court does not conclude, as appellants would have us do, that appellee's mere involvement in MAW's restructuring serves as a basis for R.C. 1707.43 liability. However, there were some activities that were related to the actual Note Offering that reasonable minds might conclude constitute a basis for holding appellee liable.

The evidence indicates that not only was there an understanding between appellee and the investment bankers that they would share information on MAW, but that such information was actually exchanged. In addition, there is evidence that appellee engaged in activities that went beyond normal commercial banking activities. In his expert report, David L. Zacharias stated that it was his opinion that appellee conceived, organized, and directly participated in the underwriting of the Note Offering. Zacharias based this opinion on the evidence in the record. This evidence could be the basis for a finding that appellee acted as a financial advisor to MAW regarding the entire restructuring of MAW, including the Note Offering.

The above evidence alone could be considered aiding the seller in any way in making the sales of the Notes at issue. Because there is evidence upon which reasonable minds could come to different conclusions on this issue, summary judgment in favor of appellee on appellants' R.C. 1707.43 claim was inappropriate.

We now turn to the trial court's grant of summary judgment in favor of appellee on appellants' fraud claim. We have already concluded that summary judgment was appropriate as to appellants' fraudulent concealment claim. However, appellants' fraud claim is also based on allegations that appellee supplied false information to the public. As indicated above, the trial court denied appellee's motion to dismiss appellants' claims for fraud and negligent misrepresentation because appellants sufficiently alleged that appellee made or participated in making material misrepresentations that appeared in the prospectus and Knight Reports and that appellee participated in the road shows. However, the trial court later granted appellee's motion for summary judgment on the fraud claim, finding that there was no evidence that would lead a reasonable juror to conclude that appellee participated in anything other than the New Credit Facility and that appellee simply referred the Note Offering to NW Markets.

Appellants contend that appellee is liable for fraud because appellee knew investors would rely on the commitment letter, which was distributed at the road shows, for assurance that MAW had an adequate level of liquidity and that

investors would rely on such in making their decision to invest. Appellee was also aware that the commitment letter would be disclosed in the prospectus and would be beneficial in marketing the Notes. Appellants contend that the commitment letter and a description of the New Credit Facility in the prospectus were false and misleading.

Appellee contends that it made no representations to appellants of any kind. Further, appellee asserts that it did not draft the prospectus, did not participate in the road shows, and nothing in the description of the New Credit Facility or the commitment letter was false.

As indicated above, the elements of fraud are:

"(a) a representation or, where there is a duty to disclose, concealment of a fact,

"(b) which is material to the transaction at hand,

"(c) made falsely, with knowledge of its falsity, or with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred,

"(d) with the intent of misleading another into relying upon it,

"(e) justifiable reliance upon the representation or concealment, and

"(f) a resulting injury proximately caused by the reliance." *Burr*, 23 Ohio St.3d 69, 23 OBR 200, 491 N.E.2d 1101, at paragraph two of the syllabus.

On March 24, 1994, appellee provided MAW with a commitment letter. That letter stated that appellee's commitment was subject to, among other things, there not having occurred any event which has or which appellee believed could have, and appellee not having discovered information which appellee believed has had or could have, a material adverse effect on the business, operations, property, condition (financial or otherwise) or prospects of MAW. This statement does not nor do any other statements in the commitment letter constitute a misrepresentation. There is nothing false in that statement.

Appellants argue that the commitment letter is misleading because it gave the public the impression that MAW had successfully completed the environmental appraisal and was in compliance with environmental regulations. As indicated above, fraud requires that there be a false representation. There simply is no false representation in the commitment letter. Further, any arguments appellants make regarding closure and postclosure costs revealed by the environmental appraisal goes to fraudulent concealment, which this court has already addressed.

As to the prospectus, any statements therein regarding the New Credit Facility was a summary only and was qualified by reference to the provisions in

the various agreements themselves. Hence, the New Credit Facility and the commitment letter spoke for themselves. As already indicated, nothing in the commitment letter was false. Further, as to the description in the prospectus, it merely stated that an environmental appraisal must be completed. This was not a false statement nor does it imply that such appraisal was completed and completed successfully or without any issues arising therefrom. As to compliance with environmental regulations, the prospectus merely stated that the New Credit Facility contained as an event of default, noncompliance with such regulations. The description of the New Credit Facility did not state that MAW was in compliance with such regulations.

Because it has not been shown that appellee made any false representations, summary judgment as to appellants' fraud claim was appropriate.

We now turn to appellants' claims for negligence/negligent misrepresentation. Appellants assert, based on the same allegations as set forth in their fraud claim, that summary judgment was inappropriate on their claims for negligence/negligent misrepresentation.

The elements of negligent misrepresentation are (1) one who, in the course of his or her business, profession or employment, or in any other transaction in which he or she has a pecuniary interest, (2) supplies false information for the guidance of others in their business transactions, (3) is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, (4) if he or she fails to exercise reasonable care or competence in obtaining or communicating the information. *Delman v. Cleveland Hts.* (1989), 41 Ohio St.3d 1, 4, 534 N.E.2d 835, 837–838, citing 3 Restatement of the Law 2d, Torts (1965) 126–127, Section 552(1); *Gutter v. Dow Jones, Inc.* (1986), 22 Ohio St.3d 286, 22 OBR 457, 490 N.E.2d 898; and *Haddon View Invest. Co.*

In *Delman,* the Supreme Court cited *Haddon View,* which this court had already addressed in the context of appellants' fraudulent concealment claim. We distinguished appellants here from the plaintiffs in *Haddon View* and found that appellants had not shown they were a group specifically known to appellee. Based upon the same analysis, appellants cannot maintain a claim for negligence/negligent misrepresentation against appellee. Therefore, summary judgment in favor of appellee as to appellants' negligence/negligent misrepresentation claim was appropriate.

In sum, summary judgment in favor of appellee on appellants' claims under R.C. 1707.41 and 1707.43 was inappropriate. However, summary judgment as to appellants' claims for fraud and negligence/negligent misrepresentation was appropriate. Accordingly, appellants' second assignment of error is sustained in part and overruled in part.

In their sixth assignment of error, appellants contend that the trial court erred in concluding that appellants could not rely on the prospectus after May 17,1995. Defendants, including appellee, moved for summary judgment on the issue of appellants' after-market purchases. The defendants argued that over three-quarters of the Notes purchased by appellants had been purchased in the after-market and not in the initial offering. Defendants asserted that by this time, the prospectus had become stale and, therefore, appellants could not recover under federal securities law or Ohio securities law for their after-market purchases. On April 21, 1999, the trial court granted defendants' joint motion for summary judgment. The trial court concluded that a reasonable juror could not conclude that the information in the prospectus was material after May 17, 1995—one year after it was issued.

Appellee contends that the trial court's order should be affirmed because the prospectus was stale and superseded, was contradicted by subsequent disclosures, and was not justifiably relied upon by appellants. Appellants contend that there is evidence disputing appellee's contentions.

R.C. 1707.41 makes any person who, by a prospectus, offers a security for sale or receives the profits accruing from such sale liable to any person who purchases the security relying on the prospectus, which contains false, material statements. Appellants contend that the trial court erred in arbitrarily concluding that the prospectus was immaterial one year after the Note Offering. We agree.

There is little case law on the point at issue here—how long a person may rely on a prospectus when purchasing a security. While the trial court may have been correct in noting that the area of securities is a fast-changing market and, therefore, investors are provided with 10–Rs, 10–Qs, and annual reports throughout the year, it does not necessarily follow that all information in a one-year old prospectus automatically becomes immaterial. R.C. 1707.41 contains no such arbitrary rule, and this court believes that such a conclusion must be based upon the evidence in each case.

Here, there was evidence that appellants actually relied on the prospectus when making after-market purchases. There is also evidence that considering a prospectus is normal course when "revisiting" a company. There is evidence that financial information from a prospectus together with subsequent 8–Ks, 10–Ks, and 10–Qs gives an overall picture of the company.

Construing the evidence most strongly in favor of appellants, a reasonable juror could find that appellants not only relied on the prospectus in making after-market purchases, but that the reliance was reasonable as the prospectus still contained material information. Therefore, the trial court erred in barring all

claims completed after May 17, 1995 on the basis a reasonable juror could not conclude the information contained in the prospectus was material after that date.

Accordingly, appellants' sixth assignment of error is sustained.

In their seventh assignment of error, appellants contend that the trial court erred in limiting their damages to the amount of their proof of claim in MAW's bankruptcy. On April 7, 1999, the defendants, including appellee, filed a motion *in limine* seeking to preclude evidence of damages in excess of the amount of appellants' proof of claim against MAW in bankruptcy proceedings. The bases for such motion were collateral and judicial estoppel. The trial court granted the defendants' motion. On appeal, appellants make several arguments in support of their contention that the trial court erred in so ruling. However, as appellee correctly points out, the trial court's granting of the motion *in limine* is not a final, appealable order.

A ruling on a motion *in limine* reflects the court's anticipated treatment of an evidentiary issue at trial and, as such, is a tentative, interlocutory ruling which the trial court is at liberty to change at trial. *State v. French* (1995), 72 Ohio St.3d 446, 450, 650 N.E.2d 887, 890–891. Here, finality never attached to the trial court's ruling as the case never went to trial. See *Dent v. Ford Motor Co.* (1992), 83 Ohio App.3d 283, 286, 614 N.E.2d 1074, 1076–1077,

We further note that the defendants properly brought the issue of preclusion of damages by way of a motion *in limine*. A motion *in limine* may be properly brought on the basis of collateral estoppel. See *New Winchester Gardens, Ltd. v. Franklin Cty. Bd. of Revision* (1997), 80 Ohio St.3d 36, 684 N.E.2d 312; *Cunningham v. Goodyear Tire & Rubber Co.* (1995), 104 Ohio App.3d 385, 392–393, 662 N.E.2d 73, 77–80. Here, the motion *in limine* sought to exclude evidence, specifically, the testimony of appellants' damages expert. The motion was not based upon insufficiency of evidence on a particular issue. Hence, the defendants properly brought this motion *in limine*.

Because the trial court's ruling on defendants' motion *in limine* is not reviewable at this time, appellants' seventh assignment of error is overruled.

In their eighth assignment of error, appellants contend that the trial court erred in denying their motion to dismiss appellee's counterclaim. On June 15, 1998, appellee filed an answer to the amended complaint and a counterclaim for indemnification/contribution. On July 14, 1998, appellants filed a motion to dismiss appellee's counterclaim. On January 29, 1999, the trial court denied appellants' motion to dismiss. Given our disposition of the previous assignments of error, the only claims remaining against appellee are the R.C. 1707.41 and 1707.43 claims. As to these claims, the trial court found that the contribution statute applied, and appellee could properly seek contribution thereunder.

██ The standard of review on motions to dismiss is that the factual allegations of the complaint (or counterclaim) must be accepted as true, and the complaining party must be afforded all reasonable inferences possibly derived therefrom. *Vail v. Plain Dealer Publishing Co.* (1995), 72 Ohio St.3d 279, 280, 649 N.E.2d 182, 184. Further, it must appear beyond doubt that the nonmoving party can prove no set of facts entitling such party to relief. *Id.*

We note first that both parties erroneously refer to former R.C. 2307.32 as the contribution statute at issue here. However, that statute was found unconstitutional in *State ex rel. Ohio Academy of Trial Lawyers v. Sheward* (1999), 86 Ohio St.3d 451, 715 N.E.2d 1062. The contribution statute at issue is R.C. 2307.31, which states:

"[I]f two or more persons are jointly and severally liable in tort for the same injury or loss to person or property * * *, there is a right of contribution among them even though judgment has not been recovered against all or any of them. * * * There is no right of contribution in favor of any tortfeasor who intentionally has caused or intentionally has contributed to the injury or loss to person or property."

Appellants contend that R.C. 2307.31 does not apply to their claims under R.C. 1707.41 and 1707.43 because R.C. 1707.41 expressly limits the right to contribution to directors seeking contribution from fellow directors. The relevant portion of R.C. 1707.41 states:

"Whenever a corporation is so liable, each director of the corporation is likewise liable unless he shows that he had no knowledge of the publication complained of, or had just and reasonable grounds to believe the statement therein to be true or the omission of facts to be not material. *Any such director, upon the payment by him of a judgment so obtained against him, shall be subrogated to the rights of the plaintiff against such corporation, and shall have the right of contribution for the payment of such judgment against such of his fellow directors as would be individually liable under this section.*" (Emphasis added.)

██ This portion of R.C. 1707.41 cannot be read as limiting contribution rights to directors. Rather, this portion, read in its entirety, merely speaks to that situation where a corporation is liable for offering a security for sale or receiving profits accruing from such sale. Of course, R.C. 1707.41 does not limit liability to corporations only. Indeed, it imposes liability on "any person." However, if a corporation is that "person," then R.C. 1707.41 makes the director(s) of such corporation likewise liable, unless certain facts are proven. Given the entire statute, R.C. 1707.41 does not limit the right of contribution for liability thereunder only to directors of corporations. Further, the mere fact that

R.C. 1707.43 is silent as to contribution rights does not mean that the legislature intended that no such right exists thereunder.

 Appellants cite *Hainbuchner v. Miner* (1987), 31 Ohio St.3d 133, 31 OBR 292, 509 N.E.2d 424, in support of their contention that R.C. 1707.41 limits contribution to directors. *Hainbuchner* does not stand for that conclusion. Rather, it merely acknowledges that a director may seek contribution from a co-director. However, we do find the reasoning in *Hainbuchner* to be applicable to the present issue in that *Hainbuchner* makes it clear that in order to obtain contribution, the liability of the person from whom one seeks contribution must be predicated upon violation of the same statute for which one has been found liable. *Id.* at 136–137, 31 OBR at 294–296, 509 N.E.2d at 426–427. R.C. 1707.41 makes this clear as to directors, and this court believes that this approach is equally applicable to any person who may be found liable under R.C. 1707.41 and who then seeks contribution thereunder.

 In its counterclaim, appellee alleged that appellants owed professional and fiduciary duties to the beneficial plaintiffs, and that each appellant breached one or more of these duties in connection with the beneficial plaintiffs' decision to invest. Appellee further alleged that appellants failed to exercise proper diligence in establishing and maintaining excessive positions in the Notes, thereby limiting appellants' ability to dispose of the Notes in the event MAW performed poorly. Appellee alleged that if liability were attributed to it, that liability was secondary and passive to the primary negligence, gross negligence, recklessness and/or intentional misconduct, including breaches of fiduciary duty, of appellants.

Even taking these allegations as true, they do not implicate appellants in violating R.C. 1707.41 and/or 1707.43. While these allegations may give rise to contribution rights under appellants' other claims (such as negligence/negligent misrepresentation), they do not give rise to contribution rights under the claims that remain under R.C. 1707.41 and 1707.43.

Hence, to the extent the trial court found appellee had a contribution right under the Ohio securities law claims, it erred, and appellee's counterclaim for contribution to this extent should have been dismissed. Accordingly, appellants' eighth assignment of error is sustained.

 We now turn to appellee's cross-appeal. In its first cross-assignment of error, appellee contends that the trial court erred in denying its motion for summary judgment on the issue of statute of limitations. On November 25, 1998, appellee filed a motion for summary judgment, contending that appellants' claims were time-barred. As to appellants' R.C. 1707.41 and 1707.43 claims, appellee contended that they were barred by a two-year statute of limitations. The trial court denied appellee's motion for summary judgment, finding that given the

evidence, there was a question of fact as to whether appellants knew or had reason to know of any wrongdoing.

R.C. 1707.43 provides the statute of limitations for claims under R.C. Chapter 1707 and states:

"No action for the recovery of the purchase price as provided for in this section, and no other action for any recovery based upon or arising out of a sale or contract for sale made in violation of Chapter 1707. of the Revised Code, shall be brought more than two years after the plaintiff knew, or had reason to know, of the facts by reason of which the actions of the person or director were unlawful, or more than four years from the date of such sale or contract for sale, whichever is the shorter period."

Appellee contends that appellants were on notice of facts purportedly supporting their claims as early as May 5, 1994, when the Oppenheimer Report was published. The Oppenheimer Report criticized MAW's accounting accruals for closure and postclosure costs, and appellants were aware of this report when it was published. In addition, appellee asserts that three months after the Note Offering, MAW's third quarter 1994 10–Q increased the accounting disclosure of $8.462 million for certain closure and postclosure costs to $44 million. In March 1995, MAW's 1994 10–K was released, which increased the estimate to $51.2 million. Further, appellee asserts that the estimates reported in the SCS report were merely a compilation of publicly available closure plans to which appellants had access prior to the Note Offering.

Appellants' complaint against appellee was filed on November 17, 1997.

Appellee contends that the above facts put appellants on notice of their claim that the $8.462 million estimate for closure and postclosure costs materially underestimated MAW's obligations and, that once put on such notice, appellants should have exercised reasonable diligence to uncover the alleged fraud. Appellants assert that they were not put on notice of underestimated and misleading closure and postclosure costs until November 1996, when MAW's third quarter 1996 10–Q contained a $256 million charge to income, $170 million of which was attributable to the understatement of accruals for closure and postclosure costs. For the reasons that follow, we find that the trial court correctly denied appellee's motion for summary judgment as to statute of limitations.

As to the Oppenheimer Report, there is evidence that appellants did follow up on it with MAW and the underwriters at the road shows, and the underwriters sufficiently responded to any concerns. In addition, Paul Knight, CFA, a waste management analyst, published a "Strategic Assessment" on June 20, 1994 indicating MAW's accounting and accruals for closure and postclosure costs were not an issue. For example, the Knight Report supported appellants' understand-

ing that MAW would .have fewer Superfund liabilities than other solid waste companies.

In addition, there is evidence to support appellants' assertion that the difference in the prospectus between the bonding disclosures and the closure and postclosure cost estimates was not an issue that required further inquiry or somehow put appellants on notice that the closure and postclosure costs were false or misleading. As to the 1994 10–Q and 10–K, there is evidence that they would not have put appellants on notice that the estimates were understated.

Clearly, the parties dispute whether certain information did or should have put appellants on notice of possible fraud or wrongdoing. Because there is evidence to support appellants' position, summary judgment would have been inappropriate on this issue, and, therefore, the trial court correctly denied appellee's motion for summary judgment on statute of limitations grounds.

Accordingly, appellee's first cross-assignment of error is overruled.

In its second cross-assignment of error, appellee requests that its counterclaim for contribution be reinstated if this court reverses any of the trial court's judgments. Given our disposition of appellants' eighth assignment of error, appellee's second cross-assignment of error is moot.

In summary, appellants' first, third, fifth, and seventh assignments of error are overruled. Appellants' fourth, sixth, and eighth assignments of error are sustained. Appellants' second assignment of error is sustained in part, as to the trial court's grant of summary judgment in favor of appellee on appellants' R.C. 1707.41 and 1707.43 claims, and overruled in part, as to the trial court's grant of summary judgment in favor of appellee on appellants' fraud and negligence/negligent misrepresentation claims. Appellee's first cross-assignment of error is overruled, and the second cross-assignment of error is moot. The judgment of the Franklin County Court of Common Pleas is affirmed in part and reversed in part, and this cause is remanded to that court with instructions to conduct further appropriate proceedings.

*Judgment affirmed in part,*
*reversed in part*
*and cause remanded.*

PETREE and KENNEDY, JJ., concur. .