AMANN et al., Appellants,

v.

CLEAR CHANNEL COMMUNICATIONS, INC., Appellee.

[Cite as *Amann v. Clear Channel Communications,*
165 Ohio App.3d 291, 2006-Ohio-714.]

Court of Appeals of Ohio,
First District, Hamilton County.

No. C–050411.

Decided Feb. 17, 2006.

William B. Singer, for appellants.

Richard M. Goehler and Jill Meyer Vollman, for appellee.

SYLVIA S. HENDON, Judge.

{¶ 1} Plaintiffs-appellants, a group of investors represented by Jerome Amann, have appealed from the trial court's grant of summary judgment in favor of defendant-appellee, Clear Channel Communications. For the following reasons, we affirm.

## Background

{¶ 2} Clear Channel Communications owns numerous radio stations in the greater Cincinnati area. Over a period of time, Clear Channel broadcast advertisements concerning a "guaranteed 10% income plus plan" promoted by George Fiorini. Clear Channel employed radio personality Bob Braun, who participated in Fiorini's advertisements and endorsed this "guaranteed 10 percent income plus plan." The plan guaranteed investors interest on the principal that they invested equal to 10 percent per annum for a period of five years. But Fiorini's plan did not perform as promised, and ultimately, it was shown to be nothing more than a fraudulent investment scheme. Amann invested in Fiorini's plan and suffered a financial loss.

{¶ 3} Amann sued Clear Channel, alleging that Clear Channel had negligently failed to investigate the veracity of the advertisement. Clear Channel filed a

motion to dismiss, which the trial court granted after converting it to a motion for summary judgment. The trial court concluded that Clear Channel had no duty to investigate the accuracy of the advertisement and that the advertisement was commercial speech protected by the First Amendment.

{¶ 4} On appeal, Amann now argues that broadcasters owe a duty of care to their audience, that Clear Channel was not entitled to First Amendment immunity, and that a broadcaster may be held liable for negligent misrepresentation in its advertising.

{¶ 5} This court reviews grants of summary judgment de novo, without any deference to the trial court's decision.[1] Summary judgment may appropriately be granted only when there exists no genuine issue of material fact; the movant is entitled to judgment as a matter of law; and the evidence, when viewed in favor of the nonmoving party, permits only one reasonable conclusion, and that conclusion is adverse to the nonmoving party.[2]

## Duty of Care and the First Amendment

{¶ 6} We first address Amann's arguments concerning the First Amendment and the duty of care owed by broadcasters to their audience. Because these arguments are related, we address them together. In essence, Amann argues that broadcasters have only limited First Amendment protection and that this limited protection requires broadcasters to exercise a duty of care to verify the accuracy of all advertisements they broadcast.

{¶ 7} Amann contends that it is the scarce resource of radio broadcast frequencies that requires this limited First Amendment protection. Amann relies in large part on *Red Lion Broadcasting Co. v. Fed. Communications Comm.*,[3] and he correctly notes that *Red Lion* does impose a limited First Amendment protection on the broadcast media in certain situations. "Although broadcasting is clearly a medium affected by a First Amendment interest, * * * differences in the characteristics of a new media justify differences in the First Amendment standards applied to them." Unfortunately for Amann, *Red Lion* is factually inapplicable to the case before us and does not involve the duty to verify the accuracy of advertisements broadcast.

{¶ 8} The Supreme Court in *Red Lion* was concerned with the Fairness Doctrine, which at the time required broadcasters to present both sides of

---

1. *Grafton v. Ohio Edison Co.* (1996), 77 Ohio St.3d 102, 105, 671 N.E.2d 241.

2. *State ex rel. Howard v. Ferreri* (1994), 70 Ohio St.3d 587, 589, 639 N.E.2d 1189.

3. (1969), 395 U.S. 367, 89 S.Ct. 1794, 23 L.Ed.2d 371.

pertinent public issues.[4]  In this context, the court's analysis focused on the broadcasting of substantive issues, not advertisements.  The court relied on the limited number of radio broadcast frequencies to uphold the Fairness Doctrine.  "Where there are substantially more individuals who want to broadcast than there are frequencies to allocate, it is idle to posit an unabridgeable First Amendment right to broadcast comparable to the right of every individual to speak, write, or publish."[5]  The court further stated, "There is nothing in the First Amendment which prevents the Government from requiring a licensee * * * to present those views and voices which are representative of his community and which would otherwise, by necessity, be barred from the airways."[6]  The crux of the court's holding was that the limited number of broadcast licenses available imposed a duty on licensees to present both sides of public issues.  This necessarily curtailed a broadcaster's First Amendment freedom.

{¶ 9} Amann attempts to extend language contained in a footnote in *Red Lion* to reach the result he desires in this case.  The language he relies on refers to broadcasters as possessing their licenses in a public trust.[7]  He argues that because a broadcast license is held in trust for the public, broadcasters necessarily owe their audience a duty of care, which includes verifying the accuracy of advertisements.  We disagree and decline to apply this language out of the context in which it originated.  *Red Lion* referred to a license as a public trust while discussing the Fairness Doctrine and equal air time.  The court nowhere discussed whether a broadcaster owes a duty of care to its audience, and we are not convinced that applying the "public trust" language to such a situation is a natural extension of the court's reasoning.[8]

---

4.  Id. at 369, 89 S.Ct. 1794, 23 L.Ed.2d 371.       .

5.  Id. at 388, 89 S.Ct. 1794, 23 L.Ed.2d 371.

6.  Id. at 389, 89 S.Ct. 1794, 23 L.Ed.2d 371.

7.  Id. at 400, 89 S.Ct. 1794, 23 L.Ed.2d 371, fn. 26.

8.  Amann also relies on similar language in *Muir v. Alabama Edn. Television Comm.* (C.A.5, 1982), 688 F.2d 1033, 1040, citing *Cosmopolitan Broadcasting Corp. v. Fed. Communications Comm.* (C.A.D.C.1978), 581 F.2d 917, 921 ("A basic premise of Commission policy is that a licensee is a 'trustee' for the public and that he must therefore assume the 'primary duty and privilege to select the material to be broadcast to his audience * * *' ").  Amann reasons that advertising is included in "material to be broadcast."  We disagree.  *Muir* solely concerned whether a broadcast licensee could be compelled to air a particular program.  *Muir* did not address advertisements, and we will not broaden this language beyond its initial context.  Interestingly, we note that *Muir* affirmed a private broadcaster's First Amendment rights by holding that it had a constitutionally protected right to the free exercise of programming discretion.

{¶ 10} *Red Lion* discussed in great detail the justifications for and the extent of the First Amendment limitations on the broadcast industry. Most notably absent from the court's opinion was any requirement that broadcasters verify the accuracy of their advertisements. The court never discussed this issue, and we cannot glean from *Red Lion* the proposition that Amann advances. Subsequent to *Red Lion,* the Supreme Court has further discussed First Amendment restrictions applicable to the broadcast industry. "[A]lthough the broadcasting industry plainly operates under restraints not imposed on other media, the thrust of these restrictions has generally been to secure the public's First Amendment interest in receiving a balanced presentation of views on diverse matters of public concern." [9]

{¶ 11} There exists no precedent that limits the broadcast media's First Amendment protection in the situation before us. Our refusal to extend the Supreme Court's explicit First Amendment limitations coincides with the court's intentions. "[It] seems clear that Congress intended to permit private broadcasting to develop with the widest journalistic freedom consistent with its public obligations." [10] We conclude that the First Amendment does protect the commercial speech in broadcast advertisements.

{¶ 12} Because radio broadcasters have full First Amendment protection in this context, it follows that they have no heightened duty to verify the accuracy of advertisements broadcast. The Ohio Supreme Court, in *Varanese v. Gall,*[11] addressed this issue in the context of a print advertisement. In *Gall,* the plaintiff alleged that she had been defamed by a political advertisement featured in the defendant's publications.[12] The court specifically addressed the media's liability for failure to check the accuracy of a paid political advertisement and held that "a mere failure to investigate the accuracy of a news story cannot, by itself, establish liability." [13]

{¶ 13} We are cognizant of the distinctions between *Gall* and the case presently before us, primarily that *Gall* involved a defamation claim and the print media. But most significant is that both *Gall* and the case sub judice involve the liability of a media defendant for an advertisement, rather than for a substantive article

---

9. *Fed. Communications Comm. v. League of Women Voters* (1984), 468 U.S. 364, 380, 104 S.Ct. 3106, 82 L.Ed.2d 278.

10. *Columbia Broadcasting Sys., Inc. v. Democratic Natl. Commt.* (1973), 412 U.S. 94, 110, 93 S.Ct. 2080, 36 L.Ed.2d 772.

11. (1988), 35 Ohio St.3d 78, 518 N.E.2d 1177.

12. Id.

13. Id. at 84, 518 N.E.2d 1177.

or broadcast. The reasoning supporting a limitation of liability for the print media applies equally to the broadcast media; the burden of verifying the accuracy of all advertisements should be equal for each. We are guided by the reasoning of *Gall*, and in the absence of explicit precedent,[14] we decline to impose the onerous requirement that Amann advances. And we can say without doubt that the burden resulting from such a requirement would certainly be, at the least, arduous. Substantial time and money would be necessary to verify the accuracy of advertisements. The trial court, in its entry of summary judgment, attempted to highlight the burden of requiring broadcasters to verify the accuracy of their advertisements: "Does oatmeal truly lower cholesterol? Does Kerry Ford truly have the lowest prices in town? Is Miller Lite truly less filling?" Although these examples are humorous, they are an accurate illustration of the havoc that such a requirement would inflict.

■ {¶ 14} Our decision today does not imply that a broadcaster can never face liability for the airing of an advertisement. To the contrary, we hold that a broadcaster cannot escape liability for deliberate, intentional, or wanton misrepresentation. We again rely on the reasoning of *Gall*, which held that liability for newspaper advertisements is "limited to those cases where the defendant actually knew the ad was false before publication, or where the ad is so inherently improbable on its face that the defendant must have realized the ad was probably false." [15] As we have already noted, there exists no basis for applying a different standard to the broadcast media in this situation. Clear Channel faces no liability under this standard. The record is devoid of evidence that Clear Channel knew that the advertisement was false or that the advertisement was inherently improbable on its face.

■ {¶ 15} In sum, we overrule Amann's arguments regarding the First Amendment and a broadcaster's duty of care. We hold that broadcasters are entitled to substantial First Amendment protection for the commercial speech in their advertisements and that broadcasters do not have a duty of care to verify the accuracy of advertisements broadcast.

---

**14.** Amann cites two cases to support his argument that broadcasters owe a duty of care to their audience. But both of these cases are factually distinguishable and involve different issues of law. *Embers Supper Club v. Scripps–Howard Broadcasting Co.* (1984), 9 Ohio St.3d 22, 9 OBR 115, 457 N.E.2d 1164, involved a substantive television broadcast (not an advertisement) and a defamation claim. *Pollock v. Rashid,* 117 Ohio App.3d 361, 690 N.E.2d 903, involved a broadcast report and claims of defamation, invasion of privacy, and intentional infliction of emotional distress. Neither influences the outcome of the present case.

**15.** *Gall,* 35 Ohio St.3d 78, 518 N.E.2d 1177.

### Negligent Misrepresentation

{¶ 16} Amann also argues that Clear Channel is liable for the tort of negligent misrepresentation. The Restatement of the Law defines this tort in the following manner:

{¶ 17} "(1) One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

{¶ 18} "(2) Except as stated in Subsection (3), the liability stated in Subsection (1) is limited to loss suffered

{¶ 19} "(a) by the person or one of a limited group of persons for whose benefit and guidance he intends to supply the information or knows that the recipient intends to supply it; and

{¶ 20} "(b) through reliance upon it in a transaction that he intends the information to influence or knows that the recipient so intends or in a substantially similar transaction." [16]

{¶ 21} The Restatement clearly indicates that liability may be imposed for negligent misrepresentation only if the disseminator of the information intends to supply it to a specific person or to a limited group of people. In the case before us, Clear Channel's advertisement was intended to be broadcast to its entire listening audience. Thus, Clear Channel faced liability only if its listening audience was a limited group of people. Several Ohio cases have discussed this issue, and although none are factually similar, their resolutions provide some guidance for our decision.

{¶ 22} In *Gutter v. Dow Jones, Inc.,*[17] the Ohio Supreme Court was presented with the issue whether a group of newspaper readers was a limited group of people. *Dow Jones* involved an article published in the Wall Street Journal that incorrectly listed certain bonds as trading with interest. Plaintiff Gutter relied on the article and purchased the bonds. But the market value of the bonds decreased, and Gutter suffered financially.[18] The court held that newspaper readers were not a special limited class of foreseeable people and that Dow Jones

---

16. Restatement of the Law 2d, Torts (1977), Section 552.

17. (1986), 22 Ohio St.3d 286, 22 OBR 457, 490 N.E.2d, 898.

18. Id.

was not liable for negligent misrepresentation.[19] The court further questioned whether it was justifiable for Gutter to rely on the status of the bonds without verifying the information found in the paper.[20]

{¶ 23} The Ohio Supreme Court reached the opposite conclusion in *Haddon View Invests. v. Coopers & Lybrand*,[21] in which it held that a group of limited partners in a partnership did constitute a limited group of people. Coopers & Lybrand performed accounting work for the plaintiff's partnership. The partnership suffered financially and collapsed, and the limited partners sued Coopers & Lybrand.[22] The court found that it was reasonably foreseeable that the limited partners would rely on Coopers & Lybrand's audits and representations, and it held that "an accountant may be held liable by a third party for professional negligence when that third party is a member of a limited class whose reliance on the accountant's representation is specifically foreseen." [23]

{¶ 24} Numerous appellate courts have also addressed this issue.[24] Precedent indicates that a determination whether the plaintiff is part of a limited group of people is fact-specific and requires a close analysis of the relationship between the parties. In the case sub judice, the group we are concerned with is Clear Channel's listening audience. This listening audience is most closely analogous to the group of newspaper readers in *Dow Jones*. Just as an entire class of newspaper readers is unknown and immeasurable, Clear Channel's listening audience is unknown and immeasurable as well.[25] It is impossible to determine

---

19. Id. at 289, 22 OBR 457, 490 N.E.2d 898.

20. Id.

21. (1982), 70 Ohio St.2d 154, 24 O.O.3d 268, 436 N.E.2d 212.

22. Id.

23. Id. at 157, 24 O.O.3d 268, 436 N.E.2d 212.

24. For a sampling, see *Hancock v. Sigg* (Sept. 1, 1995), 6th Dist. No. WM–95–010, 1995 WL 516492 (sellers of a home were not among the limited class of persons whose reliance upon an appraiser's valuation of a particular property could be specifically foreseen); *Washington Mut. Bank v. Smith,* 11th Dist. No. 2001–L–238, 2002-Ohio-6910, 2002 WL 31812944 ("an appraiser preparing a report for a lending institution should foresee that the purchaser of the property listed on the appraisal form could be within the limited class of persons who would rely on the appraisal"); *Younkman v. Riebel* (Dec. 30, 1982), 10th Dist. No. 82AP–260 (it was reasonably foreseeable that a potential purchaser of a home would rely on a report detailing a gas inspection of the property for sale); and *Merrill v. William E. Ward Ins.* (May 6, 1993), 87 Ohio App.3d 583, 622 N.E.2d 743 (a life insurance company could reasonably foresee reliance by the children of a deceased policy holder upon incorrect representations made to the policy holder).

25. In his brief, Amann states that Clear Channel's target audience consisted of persons 50 years of age and over. But to support this statement, Amann relies on a motion from a

how many people actually heard Fiorini's advertisement, which was available to anyone in the Greater Cincinnati area who had the radio on at the exact time the advertisement was broadcast. We are faced with only one reasonable conclusion: Clear Channel's listening audience was not a limited group of people.

{¶ 25} Our conclusion is supported by a comment in the Restatement discussing this issue. Comment h provides, "It is enough that the maker of the representation intends it to reach and influence either a particular person or persons, known to him, or a group or class of persons, distinct from the much larger class who might reasonably be expected sooner or later to have access to the information * * *." [26] Clear Channel did not intend to influence any particular person or group. Rather, it intended to reach the large general class consisting of its entire listening audience.

## Conclusion

{¶ 26} The trial court correctly granted summary judgment in favor of Clear Channel. Clear Channel was entitled to First Amendment protection for the commercial speech broadcast in its advertisements; it did not owe its audience a duty of care to verify the accuracy of advertisements broadcast; and it was not liable for the tort of negligent misrepresentation. Because there was no genuine issue of material fact and Clear Channel was entitled to judgment as a matter of law, we affirm the trial court's judgment.

Judgment affirmed.

GORMAN, P.J., and PAINTER, J., concur.

---

companion case presently pending in the trial court. Because this motion is not part of the record on appeal, we do not consider it. We do point out that even if Clear Channel had a target audience, it is not possible to show that only the target audience heard the advertisement.

**26.** Restatement of the Law 2d, Torts (1977), Section 552, Comment h.