RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 12a0398p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT
_____

OHIO POLICE & FIRE PENSION FUND; OHIO
PUBLIC EMPLOYEES RETIREMENT SYSTEM;
STATE TEACHERS RETIREMENT SYSTEM OF
OHIO; SCHOOL EMPLOYEES RETIREMENT
SYSTEMS OF OHIO; OHIO PUBLIC EMPLOYEES
DEFERRED COMPENSATION PROGRAM,
>                               *Plaintiffs-Appellants*,
>
>
> *v.*
>
>
> STANDARD & POOR'S FINANCIAL SERVICES
> LLC; THE MCGRAW-HILL COMPANIES, INC.;
> MOODY'S CORP.; MOODY'S INVESTORS
> SERVICE, INC.; FITCH, INC.,
>                               *Defendants-Appellees*.

No. 11-4203

Appeal from the United States District Court
for the Southern District of Ohio at Columbus.
No. 2:09-cv-1054—James L. Graham, District Judge.

Argued: October 10, 2012

Decided and Filed: December 3, 2012

Before: GILMAN, GIBBONS, and ROGERS, Circuit Judges.

_____

## COUNSEL

**ARGUED:** Elizabeth J. Cabraser, LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP, San Francisco, California, for Appellants. Floyd Abrams, CAHILL, GORDON & REINDEL LLP, New York, New York, for Appellees. **ON BRIEF:** Elizabeth J. Cabraser, LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP, San Francisco, California, Steven E. Fineman, Daniel P. Chiplock, Michael J. Miarmi, LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP, New York, New York, John P. Gilligan, Matthew L. Fornshell, Columbus, Ohio, for Appellants. Floyd Abrams, Tammy L. Roy, CAHILL, GORDON & REINDEL LLP, New York, New York, Drew H. Campbell, BRICKER & ECKLER LLP, Columbus, Ohio, Joshua M. Rubins, SATTERLEE STEPHENS BURKE & BURKE LLP, New York, New York, Martin Flumenbaum, Roberta A. Kaplan, James J. Beha II, PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP, New York, New York, Thomas D. Warren, BAKER

& HOSTETLER LLP, Cleveland, Ohio, for Appellees. Marion H. Little, Jr., ZEIGER, TIGGES & LITTLE LLP, Columbus, Ohio, for Amicus Curiae.

———————————

**OPINION**

———————————

JULIA SMITH GIBBONS, Circuit Judge.  The plaintiffs to this action are five pension funds operated by the State of Ohio for public employees (the "Funds").  The Funds invested hundreds of millions of dollars in 308 mortgage-backed securities ("MBS") between 2005 and 2008, all of which received a "AAA" or equivalent credit rating from one of the three major credit-rating agencies (the "Agencies").[1]  The value of MBS collapsed during this period, leaving the Funds with estimated losses of $457 million.  In an effort to recoup some of these losses, the Funds brought suit against the Agencies under Ohio's "blue sky" laws and a common-law theory of negligent misrepresentation, alleging that the Agencies' ratings were false and misleading and that the Funds' reasonable reliance on those ratings caused their losses.  The district court granted the Agencies' motion to dismiss the entire complaint with prejudice.  The Funds now appeal that ruling.  For the reasons set forth below, we affirm the judgment of the district court.

I.

A.

MBS are "financial products whose value is derived from and collateralized by (*i.e.*, 'backed' by) the revenue stream flowing from" a pool of residential or commercial mortgage loans.  Compl. at ¶ 31.  An MBS offering is initiated by an "arranger," "typically an investment bank," that buys mortgage loans from lenders and transfers those loans to an affiliated "bankruptcy remote trust" that is "immune from any bankruptcy the arranger might suffer and vice versa."  *Id.*  ¶ 32.  The trust then offers

———————————

[1]Standard & Poor's Financial Services LLC (a wholly-owned subsidiary of The McGraw-Hill Companies, Inc.), Moody's Investors Service, Inc. (a wholly-owned subsidiary of Moody's Corp.), and Fitch, Inc.

securities collateralized by this pool of mortgages to investors and uses the funds earned from the sale to cover the costs of acquiring mortgage loans and organizing the offer. *Id.* ¶ 33. As the owner of the mortgage loans, the trust is entitled to principal and interest payments made by mortgagees. Those payments are passed on to the purchasers of the securities in the form of principal and interest payments. *Id.*

Arrangers can increase or decrease the risk investors assume when purchasing MBS by altering one of two features of the capital structure of these investments. *Id.* ¶ 34. First, arrangers can adjust the "overcollateralization" of the securities, which is the amount by which the principal balance of the mortgage pool exceeds the principal balance of the issued securities. *Id.* ¶ 35. This creates a "buffer" zone before mortgage defaults result in losses for investors. *Id.* Second, arrangers can change the "excess spread" of the securities, which is the difference between the interest received on the mortgages and the interest paid out to investors. *Id.* The excess spread can be applied toward delinquent interest payments or used to build up loss reserves. *Id.* The degree to which securities incorporate these risk-prevention features is known as "credit enhancement." Arrangers can further apportion risk by issuing multiple classes, or "tranches," of securities collateralized by the same underlying asset pool. *Id.* Tranches are prioritized by their level of credit enhancement. *Id.* Accordingly, investors in the lowest tranche have the lowest up-front costs, but they also bear the lowest level of credit enhancement and would have all losses of payments and interest allocated to them before investors in the next highest tranche could be affected. *Id.* By contrast, the Funds paid premium prices for "AAA"-rated funds in the highest tranche, which provided the greatest amount of credit enhancement. *Id.* ¶¶ 3, 38, 100.

## B.

It was the role of the Agencies to assess how much risk investors assumed when they purchased MBS. Arrangers typically initiated this process by sending the Agencies data on the sort of mortgages they planned to acquire and securitize, along with their proposed capital structure. *Id.* ¶ 37. The Agencies used statistical modeling to predict how many of the pooled mortgage loans would enter default, as well as how much of the

principal balance of the loan the arranger could expect to recover after a default.  *Id.* Based on these predictions, the Agencies would run "stress tests" in order to determine "how much credit enhancement a given tranche security needed to receive a particular credit rating."  *Id.* ¶ 38.  They would then look at the proposed capital structure to see if it provided an appropriate level of credit enhancement and report their findings to the arranger.  *Id.* ¶ 39.  Once the arranger settled on a capital structure and estimated rating for each tranche, the Agency would perform a final review of the estimated cash flow and legal documentation of the proposed MBS offering before providing a final rating. *Id.* ¶ 40.  The Agency would earn its fee if the desired rating issued.  *Id.* ¶¶ 39–40.  At any point in this process, the arranger could reject the Agency's proposed rating.  *Id.*

The Funds allege that between 2005 and 2008, this "issuer pays" system compromised the integrity of the credit rating process.  *Id.* ¶ 52.  In an effort to attract the significant rating fees paid by MBS arrangers, the Agencies "became intimately involved in the issuance of [MBS]" by assisting arrangers in structuring their securities to achieve certain credit ratings, turning the process into a form of negotiation and placing the Agencies in the position of "rating their own work."  *Id.* ¶¶ 56, 65, 80. Nonetheless, the Agencies continued to publicize the objectivity, independence, and analytical rigor of their rankings, despite privately acknowledging the "latent conflict of interest" in their business model.  *Id.* ¶¶ 43–51, 66.  In addition, the desire to attract business led the Agencies to lower their rating standards.  *Id.* ¶¶ 82–93.  They preferred older, more forgiving debt models over more up-to-date ones that might result in the rejection of an arranger's proposed capital structure.  *Id.* ¶ 85.  Analysts would also perform "out of model" corrections  to achieve a certain rating for a security that computer models did not justify.  *Id.* ¶¶ 92–93.  The Funds allege that the Agencies did not properly disclose the weaknesses of the Agencies' ratings, that the Agencies knew investors like the Funds would rely on the accuracy of their ratings in making investment decisions, and that the Agencies' failure to make proper disclosures caused the significant losses the Funds experienced when the MBS market collapsed.  *Id.* ¶¶ 97–101.

The complaint describes these practices at a high level of generality. It draws its allegations from publicly available reports, newspapers, and magazines explaining problems with the Agencies' business model from 2005 to 2008. Although the complaint includes an exhaustive appendix of the 308 MBS the Funds purchased, no fact alleged in the complaint is connected to any particular rating given by an Agency for a security the Funds purchased during the period in question.

## C.

The complaint contains three counts: (1) common-law negligent misrepresentation; (2) violation of Ohio Rev. Code § 1707.41; and (3) violation of Ohio Rev. Code § 1707.43. The district court granted a motion to dismiss the entire complaint for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6) and entered judgment with prejudice in favor of the Agencies. At no point in the district court proceedings did the Funds seek to amend their complaint. This timely appeal followed.

## II.

A district court's order granting a Rule 12(b)(6) motion receives *de novo* review on appeal. *Courie v. Alcoa Wheel & Forged Prods.*, 577 F.3d 625, 629 (6th Cir. 2009). We must "construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff." *Directv, Inc. v. Treesh*, 487 F.3d 471, 476 (6th Cir. 2007). Despite this liberal pleading standard, we "may no longer accept conclusory legal allegations that do not include specific facts necessary to establish the cause of action." *New Albany Tractor, Inc. v. Louisville Tractor, Inc.*, 650 F.3d 1046, 1050 (6th Cir. 2011). Rather, the complaint has to "plead[] factual content that allows the court to draw the reasonable inference that the defendant[s are] liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). If the Funds do "not nudge[] their claims across the line from conceivable to plausible, their complaint must be dismissed." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

Because the district court exercised diversity jurisdiction, this court must "apply [New York and Ohio] substantive law to the state-law claims presented," as interpreted by their respective state supreme courts. *Beverage Distribs., Inc. v. Miller Brewing Co.*, 690 F.3d 788, 792 (6th Cir. 2012). If those courts have not ruled on a particular issue, "'this [c]ourt must predict how [they] would rule, by looking to all relevant data, including state appellate decisions.'" *Id.* (quoting *Kessler v. Visteon Corp.*, 448 F.3d 326, 330 (6th Cir. 2006) (internal quotation marks omitted)).

### III.

Section 1707.41(A) of the Ohio Revised Code, enacted in 1913, creates "an express private civil cause of action for the use of false sales materials." Thomas E. Geyer et al., *Civil Liability and Remedies in Ohio Securities Transactions*, 70 U. Cin. L. Rev. 939, 1009 (2002). It provides:

> [A]ny person that, by a written or printed circular, prospectus, or advertisement, *offers any security for sale, or receives the profits accruing from such sale*, is liable, to any person that purchased the security relying on the circular, prospectus, or advertisement, for the loss or damage sustained by the relying person by reason of the falsity of any material statement contained therein or for the omission of material facts . . . .

Ohio Rev. Code § 1707.41(A) (emphasis added). The Funds do not allege that the Agencies "sold" or "offer[ed] . . . for sale" the securities they rated; that was the arrangers' role. Therefore, this claim turns on whether or not the Agencies "receive[d] the profits accruing from" the issuance and sales of MBS. The district court held that they did not because the Agencies were paid for "work performed in preparation for a securities offering" and their fees were "not contingent upon an actual sale." *Ohio Police & Fire Pension Fund v. Standard & Poor's Fin. Servs., LLC*, 813 F. Supp. 2d 871, 878 (S.D. Ohio 2011) [hereinafter *OPFPF*].

"When interpreting legislation, courts must give the words used in statutes their plain and ordinary meaning, unless legislative intent indicates otherwise." *Coventry Towers, Inc. v. City of Strongsville*, 480 N.E.2d 412, 414 (Ohio 1985). Particularly in

the context of business and finance, the "plain and ordinary meaning" of the word "profit" is "[t]he excess of revenues over expenditures in a business transaction." *Black's Law Dictionary* 1329 (9th ed. 2009). Sources from the time of section 1707.41(A)'s passage also reflect this understanding. *See Eyster v. Centennial Bd. of Fin.*, 94 U.S. 500, 503 (1876) ("[T]he receipts of the exhibition, over and above its current expenses, are the profits of the business. . . . They are, in fact, the net receipts, which, according to the common understanding, ordinarily represent the profits of a business."); *Webster's Revised Unabridged Dictionary* 1144 (1913) ("Acquisition beyond expenditure; excess of value received for producing, keeping, or selling, over cost; hence, pecuniary gain in any transaction or occupation; emolument; as, a profit on the sale of goods."). Since "profit" is contingent upon expenses incurred and revenue generated, a seller's promise to share "the profits accruing from [the] sale" does not guarantee that the promisee will receive any payment at all. *See United States v. Santos*, 553 U.S. 507, 517 (2008) (plurality opinion) ("[B]y definition profits consist of what remains after expenses are paid.").

The Agencies' rating fees were fixed costs of an MBS issue. As the complaint notes, the Agencies' entitlement to a fee vested when their ratings issued. The fees did not vary based on the amount by which revenues exceeded expenditures, or the amount of shares sold. One MBS offering document that the Funds rely upon heavily in their briefing is illustrative of this relationship:

> [T]he net proceeds from the sale of the Offered Certificates will be applied by the Depositor to pay for the acquisition of the Mortgage Loans from the Seller, as well as to pay the costs of structuring and issuing the securities, which generally consists of legal, accounting and rating agency fees . . . .

*Id.* ¶ 119(e). Even though the arrangers contemplated using monies generated by the sale of the securities to satisfy the costs of retaining the Agencies, payments to the Agencies were part of "the costs of structuring and issuing the securities," similar to "legal" and "accounting" fees. Accordingly, these fees lacked the contingent quality that is characteristic of profits.

The Funds argue that the Agencies "receive[d] the profits" from the sale of MBS merely because they were paid out of the "proceeds" or "net proceeds" of MBS sales. But this argument confuses the source of payment with the manner in which the amount of payment is determined. Because the Agencies were not entitled to what remained of the "proceeds" of MBS sales "after expenses [were] paid," *Santos*, 503 U.S. at 517, it is not relevant that they were paid out of "proceeds" or "net proceeds," and the district court was correct to reject this argument.

The *amicus curiae* argues "profit" can mean "benefit, advantage, or pecuniary gain," and that under this definition, the Agencies are liable. "Profit" can bear this meaning in certain usages. *Webster's Revised Unabridged Dictionary* 1144 (1913) ("Accession of good; valuable results; useful consequences; benefit; avail; gain; as, an office of profit."). But this is not an appropriate definition in the context of this statute, for two reasons. First, the use of a definite article in front of "profits," and the requirement that "the profits accru[e] from such sale," suggest that the word "profits" is referring to the definite quantity of "revenue minus expenses," and not to any "gain" or "benefit" arising from a securities sale. Second, in the context of a securities-fraud statute, it would be unusual to give the word "profit" a meaning other than the "plain and ordinary" one widely accepted in business and finance. *See Mut. Bldg. & Inv. Co. v. Efros*, 89 N.E.2d 648, 650–51 (Ohio 1949) ("The language employed in a statute must be accorded its common, ordinary and usually accepted meaning *in the connection in which it is used* . . . ." (emphasis added)).

This distinction between sharing profits and paying business expenses has been recognized in *dicta* by a leading Ohio case interpreting this section of the "blue sky" laws. In *Federated Management Co. v. Coopers & Lybrand*, 738 N.E.2d 842, 858 (Ohio Ct. App. 2000), the defendant bank received a "referral fee" consisting of a percentage of "the proceeds the underwriter received from" the sale of debt notes issued by a solid waste management company. The bank argued that these payments, which "were based directly on the [n]ote [o]ffering," were "akin to fees earned by attorneys and printers

who worked for an underwriter." *Id.* In concluding that the bank had "profited from the sale of the securities," the Ohio Court of Appeals rejected this argument:

> Attorneys who perform services for underwriters in connection with a securities offering . . . receive their fee regardless of whether the securities actually went up for sale. Here, [the bank] received its fees because the underwriter received its fees, and the underwriter received its fee (a fee that was directly based upon the price of the [n]otes) because the [n]ote [o]ffering actually occurred. [The bank] received profits accruing from the sale of securities . . . .

*Id.*

The Funds attempt to analogize the case before us to *Federated Management* because, in both cases, there was a "causal connection" between the securities offerings and their fees. This is an oversimplification. Because the bank in *Federated Management* agreed to take a percentage of sales proceeds as its referral fee, the fee was contingent on the "profitability" of the securities offering. By contrast, even though the Agencies were paid out of the proceeds of MBS sales, their fees were fixed business costs that would have to be satisfied regardless of whether the securities "actually went up for sale." In this respect, the Agencies are more akin to the attorneys and accountants described in *Federated Management*, a similarity the prospectus quoted above implies by grouping "rating agency" fees with "legal" and "accounting" fees. Accordingly, *Federated Management* supports the conclusion that ratings fees cannot be considered "profits" for purposes of section 1707.41(A).

The Funds also rely upon *Baker v. Conlan*, 585 N.E.2d 543 (Ohio Ct. App. 1990). In that case, a corporation served as a general partner of a limited partnership that intended to purchase a horse for breeding and sell its offspring. 585 N.E.2d at 544. After selling shares in the limited partnership to investors, the venture collapsed. *Id.* at 545. The corporation, along with its director, was found liable under section 1707.41(A). *Id.* at 549–50. In affirming the finding of liability against the corporation, the Ohio Court of Appeals observed that the corporation "had received some of the proceeds from the investors, and was therefore liable as a recipient of the 'profits accruing from' the sales." *Id.* at 548. The Funds focus on the *Baker* court's use of the

word "proceeds" and argue that this shows that the receipt of "proceeds" is sufficient to create liability under section 1707.41(A). This reading of the case elevates form over substance. The corporation was not offering a service prior to the sale of securities for which it was promised payment, independent of whether or not sale of the securities was successful. Because it does not speak to the facts of this case, we find *Baker* to be unpersuasive.

Two remaining arguments in support of the Funds' interpretation of the statute need be addressed only briefly. First, the Funds cannot circumvent the statute by arguing that profits from *previous* MBS sales were used to pay the Agencies' rating fees. This claim contradicts the Funds' consistent allegations that arrangers paid the Agencies for their work on a particular security out of the funds generated by offering that security for sale. But even if the complaint supported this about-face, the statute creates liability only when the plaintiff purchased "the security" sold under false pretenses, and the defendant received profits from "such sale," not from sales of unrelated securities offered on a previous occasion. Ohio Rev. Code § 1707.41(A) ("[A]ny person that . . . offers any security for sale, or receives the profits *accruing from such sale* . . . is liable, to any person that purchased *the security . . . .*" (emphasis added)). Second, the mandate of the Ohio courts to construe section 1707.41(A) "liberally," *In re Columbus Skyline Secs., Inc.*, 660 N.E.2d 427, 429 (Ohio 1996), does not authorize this court to ignore the plain meaning of statutory text or disregard Ohio case law interpreting the statute, *Lake Hosp. Sys., Inc. v. Ohio Ins. Guar. Ass'n*, 634 N.E.2d 611, 614 (Ohio 1994) ("There is no need to liberally construe a statute whose meaning is unequivocal and definite."). We conclude that the district court correctly dismissed the Funds' section 1707.41(A) claim.

IV.

The second statute under which the Funds seek relief, entitled "Remedies of purchaser in unlawful sale," provides:

> [E]very sale or contract for sale made in violation of Chapter 1707. of the Revised Code, is voidable at the election of the purchaser. *The person making such sale or contract for sale, and every person that has*

> *participated in or aided the seller in any way in making such sale or contract for sale*, are jointly and severally liable to the purchaser . . . .

Ohio Rev. Code § 1707.43(A) (emphasis added). This provision has an unusual dual nature. Its primary purpose is to confer a rescission remedy on victims of securities fraud. *See Martin v. Steubner*, 485 F. Supp. 88, 101 (S.D. Ohio 1979) ("[Section 1707.43(A)] is not punitive but simply permits the purchaser to rescind the transaction and puts the parties in the position they were in before the contract was entered into."). But the statute also imposes secondary liability on those who "participate[ ] in or aid[ ] the seller in any way in making such sale or contract for sale," presuming the existence of a "sale or contract for sale made in violation" of the "blue sky" laws. Ohio Rev. Code § 1707.43(A). The district court dismissed this claim because the Funds failed to plead either a violation of the securities laws by the Agencies themselves or another party's violation of the laws that the Agencies "participated in or aided." *OPFPF*, 813 F. Supp. 2d at 878–79.

The Funds primarily rely upon the Agencies' alleged violation of section 1707.41(A) to support their section 1707.43(A) entitlement to rescission. As discussed above, that argument lacks merit. In order to salvage their rescission remedy, the Funds claim that two different predicate violations can be reasonably inferred from the complaint: violations of section 1707.41(A) by the arrangers in issuing the securities the Funds purchased, and violations of section 1707.44(B) by the Agencies themselves. As explained below, neither argument preserves the Funds' section 1707.43(A) claim. The *amicus curiae* suggests an additional possibility, section 1707.44(J), which the Funds did not argue themselves, and we will not consider. *See Cellnet Commc'ns, Inc. v. F.C.C.*, 149 F.3d 429, 443 (6th Cir. 1998).

## A.

We look first to the Funds' assertion that the Agencies can be held liable for the arrangers' violations of Ohio law. The complaint does not allege that any entity other than the Agencies committed securities fraud, even in conclusory terms. The best the Funds can do is to argue that the complaint alleges arrangers "took advantage of the

'issuer-pays' model to pressure the Rating Agencies into assigning false or misleading ratings to the subject MBS," but that is not the equivalent of claiming that the arrangers actually made material misrepresentations or omissions in written form, in violation of section 1707.41(A). Even if that were sufficient, the portion of the complaint the Funds rely upon to establish this claim is devoid of allegations of pressure to make false statements by the arrangers. *See* Compl. ¶¶ 42–75. The Funds claim that this reading of the complaint represents a misapplication of Federal Rule of Civil Procedure 9(b)'s "particularity" requirement for fraud claims to section 1707.41(A). But the Funds have not even satisfied Rule 8(a)'s "plausibility" standard, having offered no facts from which a reasonable inference of wrongdoing by unnamed arrangers could be drawn. *See Iqbal*, 556 U.S. at 678. The complaint accordingly falls short of alleging a section 1707.41(A) violation by the arrangers.

B.

We also reject the Funds' attempt to save their rescission remedy by claiming the Agencies violated section 1707.44(B)(4) of the Ohio Revised Code. The statute provides:

> No person shall knowingly make or cause to be made any false representation concerning a material and relevant fact, in any oral statement or in any prospectus, circular, description, application, or written statement, for [the] purpose[ of] . . . [s]elling any securities in this state . . . .

Ohio Rev. Code § 1707.44(B)(4). Unlike section 1707.41(A), this statute "prohibit[s] only affirmative misrepresentation; [it does] not apply to fraudulent nondisclosure." *State v. Warner*, 564 N.E.2d 18, 38 (Ohio 1990). The Funds could have proceeded against the Agencies under section 1707.44(B)(4) when they filed their complaint, but chose not to, and for good reason. As explained in greater detail in section V.B, *infra*, the complaint does not adequately plead affirmative misrepresentations by the Agencies. Accordingly, the Funds have not alleged a predicate violation of 1707.44(B) and we dismiss the Funds' claim for rescission under section 1707.43(A).

V.

The final theory of liability under which the Funds seek relief against the Agencies is common-law negligent misrepresentation. The parties disagreed below about whether Ohio or New York common law governed the claims, but the district court found that under the law of either state, the claims failed. *OPFPF*, 813 F. Supp. 2d at 879. In Ohio, negligent misrepresentation is defined as follows:

> One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

*Delman v. City of Cleveland Heights*, 534 N.E.2d 835, 838 (Ohio 1989) (emphasis omitted) (quoting *Restatement (Second) of Torts* § 552(1) (1965)). A similar definition maintains under New York law.[2] The district court correctly held that the Funds lacked a viable claim under either Ohio or New York law because they (1) did not properly allege a duty owed by the Agencies to the Funds, and (2) the ratings were not actionable misrepresentations.

A.

The district court found that the Funds failed to plead a duty of care under New York law, although it did not discuss New York cases in any detail. The point needs little discussion. New York law "'strictly limits negligent misrepresentation claims to situations involving actual privity of contract between the parties or a relationship so close as to approach that of privity.'" *Anschutz Corp. v. Merrill Lynch & Co.*, 690 F.3d

---

[2]    (1) [T]he defendant had a duty, as a result of a special relationship, to give correct information; (2) the defendant made a false representation that he or she should have known was incorrect; (3) the information supplied in the representation was known by the defendant to be desired by the plaintiff for a serious purpose; (4) the plaintiff intended to rely and act upon it; and (5) the plaintiff reasonably relied on it to his or her detriment.

*Hydro Invs., Inc. v. Trafalgar Power Inc.*, 227 F.3d 8, 20 (2d Cir. 2000).

98, 114 (2d Cir. 2012) (internal quotation marks omitted) (quoting *In re Time Warner Inc. Secs. Litig.*, 9 F.3d 259, 271 (2d Cir. 1993)); *see also Ossining Union Free Sch. Dist. v. Anderson LaRocca Anderson*, 539 N.E.2d 91, 94 (N.Y. 1989). In *Anschutz*, the Second Circuit dismissed negligent misrepresentation claims under New York law against the Agencies similar to those made by the Funds in this case. *Id.* at 114–15 ("[Plaintiff] has alleged no relationship or contact with the Rating Agencies that could remotely satisfy the New York standard."). In this case, as in *Anschutz*, there are no allegations of contacts between the Funds and the Agencies establishing a relationship "so close as to approach that of privity." We adopt the Second Circuit's reasoning and affirm the district court's holding that the Agencies did not owe the Funds a duty of care under New York law.

Determining whether a duty of care exists under Ohio law is not as straightforward. Ohio cases generally agree that speakers do not owe a duty of care to the "extensive, faceless, and indeterminable investing public-at-large." *Federated Mgmt.*, 738 N.E.2d at 856. "[L]iability may be imposed for negligent misrepresentation only if the disseminator of the information intends to supply it to a specific person or to a limited group of people." *Amann v. Clear Channel Commc'ns, Inc.*, 846 N.E.2d 95, 100 (Ohio Ct. App. 2006); *see also Picker Int'l, Inc. v. Mayo Found.*, 6 F. Supp. 2d 685, 689 (N.D. Ohio 1998) ("A core requirement [of negligent misrepresentation claims] is a special relationship under which the defendant supplied information to the plaintiff for the latter's guidance in its business transactions."). For instance, accountants owe a duty of care not merely to their clients, but to any "third party [that] is a member of a limited class whose reliance on the accountant's representation is specifically foreseen." *Haddon View Inv. Co. v. Coopers & Lybrand*, 436 N.E.2d 212, 215 (Ohio 1982) (finding limited partners were owed a duty of care by an accounting firm their general partner hired to perform accounting work); *see also Picker*, 6 F. Supp. 2d at 689 ("Usually the defendant is a professional . . . who is in the business of rendering opinions to others for their use in guiding their business, and the plaintiff is a member of a *limited* class."). By contrast, "a newspaper reader" is not part of a "special limited class . . . of foreseeable persons," and therefore, newspaper reporting is beyond the reach of a negligent misrepresentation

claim. *Gutter v. Dow Jones, Inc.*, 490 N.E.2d 898, 900 (Ohio 1986); *see also Amann*, 846 N.E.2d at 100–01 (holding that radio show listeners are not a "limited class" under *Haddon View*).

Ohio courts have applied *Haddon View* in contexts where third parties closely linked to a person in privity with the defendant could reasonably be expected to rely on information the defendant provided to that person. *See Merrill v. William E. Ward Ins.*, 622 N.E.2d 743, 748–49 (Ohio Ct. App. 1993) (insurer owed duty of care to beneficiaries of a life insurance contract); *Perpetual Fed. Sav. & Loan v. Porter & Peck, Inc.*, 609 N.E.2d 1324, 1327 (Ohio Ct. App. 1992) (finding issue of material facts at to whether appraisal agency owed duty of care to bank that loaned money in reliance on a property appraisal report prepared for the bank's mortgage broker); *but see Floor Craft Floor Covering, Inc. v. Parma Comm. Gen. Hosp. Ass'n*, 560 N.E.2d 206, 208–10 (Ohio 1990) (refusing to acknowledge a duty of care in a contractor's suit against an architect when there was no privity of contract between them, distinguishing *Haddon View*). In practice, the rule appears to work in much the same way that New York's rule of privity or "near-privity" works. That is not surprising, since *Haddon View* borrowed its analytic framework from New York cases. *See Haddon View*, 436 N.E.2d at 155–56 (discussing *Ultramares Corp v. Touche, Niven & Co.*, 174 N.E. 441 (N.Y. 1931) (Cardozo, J.), and *White v. Guarente*, 372 N.E.2d 315 (N.Y. 1977)).

Although the Funds claim that they are part of a "limited class," Compl. ¶ 158, the complaint proves otherwise. Of the 308 MBS the Funds purchased, 254 of them were publicly available securities any investor could have acquired. This is precisely the sort of claim for representations made to the "faceless" investing public that Ohio courts reject. The claim is not salvaged by the Agencies' alleged role in structuring funds, the creation of "pre-sale" reports containing ratings that were used by arrangers to market MBS, or the contingent relationship between providing a desired rating and receiving rating fees. None of these considerations changes the fundamental reason for the failure of this claim: there is no "special relationship" between the Funds and the Agencies.

Conceding the weakness of their claim as a whole, the Funds focus on the fifty-four remaining securities mentioned in the complaint. These MBS were "private placements," securities offered only to "qualified institutional buyers" that "own[ ] and invest[ ] on a discretionary basis at least $100 million in securities." *Anegada Master Fund, Ltd. v. PXRE Grp. Ltd.*, 680 F. Supp. 2d 616, 621 (S.D.N.Y. 2010). The complaint does not plead such a distinction, but the district court ruled that even if it did, the distinction would not be sufficient to cure the complaint's defects. We agree. The *Haddon View* rule is a narrow exception to the general principle that privity limits the scope of liability for professional negligence, and Ohio courts have not been eager to expand it. *Haddon View*, 436 N.E.2d at 214–15. Even if the Funds were to limit their challenge to those MBS offered to "qualified investors," such a class includes thousands of investors who lack privity or a similarly close relationship to the Agencies, and is not "limited" in the sense understood by *Haddon View*. *See* Richard Baumann, *A Big Surprise*, Int'l Fin. L. Rev., Nov. 2007, at 30 (noting that the United States has "thousands" of qualified investors, and that underwriting banks marketed restricted securities to them "as if [they] constituted their own mini-public").

As the district court held, there is no sound basis under either Ohio or New York law for concluding that the Agencies owed a duty of care to the Funds in this case.

### B.

The district court was also correct to dismiss the negligent misrepresentation claims because the complaint does not plausibly allege actionable misrepresentations. Under Ohio law, "'[an actionable] misrepresentation generally must relate to an existing or pre-existing fact which is susceptible of knowledge.'" *Kondrat v. Morris*, 692 N.E.2d 246, 251 (Ohio Ct. App. 1997) (quoting *Platsis v. E.F. Hutton & Co.*, 642 F. Supp. 1277, 1293 (W.D. Mich. 1986)). A statement "is actionable only when an affirmative false statement has been made." *Leal v. Holtvogt*, 702 N.E.2d 1246, 1261 (Ohio Ct. App. 1998). New York law imposes a similar requirement. *Schwalb v. Kulaski*, 814 N.Y.S.2d 696, 698 (N.Y. App. Div. 2006). So defined, credit ratings are not actionable misrepresentations. As we noted in an analogous context, "[a] . . . credit rating is a

predictive opinion, dependent on a subjective and discretionary weighing of complex factors," and there is "no basis upon which we could conclude that the credit rating itself communicates any provably false factual connotation." *Compuware Corp. v. Moody's Investors Servs., Inc.*, 499 F.3d 520, 529 (6th Cir. 2007) (concluding that a credit rating was insufficient to establish a defamation claim under Michigan law because the rating did not "connote[ ] actual, objectively verifiable facts"); *see also Plumbers' Union Local No. 12 Pension Fund v. Nomura Asset Acceptance Corp.*, 632 F.3d 762, 776 (1st Cir. 2011) ("That a high rating may be mistaken, a rater negligent in the model employed or the rating company interested in securing more business may be true, but it does not make the report of the rating false or misleading.").

The Funds argue that although this general rule is correct, a "fraudulently made" opinion could nonetheless be considered actionable. Ohio cases support the proposition that some opinions are "actionable," but do not provide specifics. *See Link v. Leadworks Corp.*, 607 N.E.2d 1140, 1145 (Ohio Ct. App. 1992); *Davish v. Arn*, 32 Ohio Law Abs. 646, 655 (Ohio Ct. App. 1940). By contrast, some cases applying New York law specifically recognize that "statements of opinion may support" a negligent misrepresentation claim "when a plaintiff alleges that the defendant did not genuinely or reasonably believe the opinions at the time the defendant made them." *Eaves v. Designs for Fin., Inc.*, 785 F. Supp. 2d 229, 256 (S.D.N.Y. 2011). In such a case, the misrepresentation is not the opinion, but is the speaker's assertion that he or she believes the opinion, which is a question of existing or pre-existing fact. *Fait v. Regions Fin. Corp.*, 655 F.3d 105, 112 (2d Cir. 2011) ("Requiring plaintiffs to allege a speaker's disbelief in, and the falsity of, the opinions or beliefs expressed ensures that their allegations concern the factual components of those statements."). Our cases interpreting § 10(b) of the Securities Exchange Act acknowledge a similar distinction. *Mayer v. Mylod*, 988 F.2d 635, 639 (6th Cir. 1993) (holding that opinions are actionable under § 10(b) when "the speaker does not believe the opinion and the opinion is not factually well-grounded").

The district court assumed that this exception to the general rule on liability for opinions applied to negligent misrepresentation claims under both Ohio and New York law, but nonetheless found that the Funds had not sufficiently alleged an actionable misrepresentation because "the complaint fail[ed] to allege that the . . . Agencies did not believe their ratings." *OPFPF*, 813 F. Supp. 2d at 883. We agree. Based on publicly available information describing the Agencies' business practices, the Funds draw the inference that the Agencies did not believe in the correctness of their ratings with respect to any MBS the Funds purchased over a three-year period. That inference is an unreasonable one. General criticism of business practices does not provide a basis for concluding that the Agencies made actionable misrepresentations on any particular occasion. This is precisely the sort of complaint the Supreme Court's recent Rule 8 jurisprudence is designed to preclude. *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) ("[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct," a complaint is subject to dismissal for failure to state a claim).

District courts addressing similarly amorphous claims of misrepresentation against the Agencies concur in this view. *In re Lehman Bros. Secs. & ERISA Litig.*, 684 F. Supp. 2d 485, 495 (S.D.N.Y. 2010) (dismissing complaint containing allegations similar to those made in this case because they did not "support an inference that the [Agencies] did not actually hold the opinion about the sufficiency of the credit enhancements to justify each rating at the time each rating was issued"), *aff'd*, 650 F.3d 167 (2d Cir. 2011); *Tsereteli v. Residential Asset Securitization Trust 2006-A8*, 692 F. Supp. 2d 387, 395 (S.D.N.Y. 2010) (finding allegations that the Agencies "used out-of-date models" and "did not verify the loan information provided to them" were "insufficient to support an inference that the . . . Agencies did not actually believe that the ratings they had assigned were supported by the factors they said they had considered."). Moreover, the many non-binding authorities upon which the Funds rely on appeal all involve complaints that pled specific facts suggesting the Agencies believed a particular opinion they provided was improper. *See Anschutz Corp. v. Merrill Lynch & Co.*, 785 F. Supp. 2d 799, 825 (N.D. Cal. 2011) ("Plaintiff's allegations here

are much more detailed and specific than the ones at issue in . . . the cases relied on by the [Agencies]," including *In re Lehman Bros.*); *Abu Dhabi Comm. Bank v. Morgan Stanley & Co.*, 651 F. Supp. 2d 155, 178–79 (S.D.N.Y. 2009) (summarizing complaint's allegations regarding Agencies' knowledge of credit issues with a single "structured investment vehicle" the plaintiffs purchased); *In re Nat'l Century Fin. Enterp., Inc., Inv. Litig.*, 580 F. Supp. 2d 630, 643, 648 (S.D. Ohio 2008) (detailing multiple "red flags" associated with two offerings of investment notes by a particular company that were sufficient to give rise to a negligent misrepresentation claim); *LaSalle Nat'l Bank v. Duff & Phelps Credit Rating Co.*, 951 F. Supp. 1071, 1075–80 (S.D.N.Y. 1996) (finding plaintiffs properly pled negligent misrepresentation when complaint included extensive allegations of misconduct by the ratings agency connected with a single bond offering, including the failure to discover obvious corporate fraud despite purported "due diligence" efforts and oral misrepresentations to several purchasers of the bonds).

Even if we presume that a credit rating can serve as an actionable misrepresentation, the Funds' complaint does not contain allegations that would permit a reasonable inference of wrongdoing. Accordingly, the Funds' negligent misrepresentation claims may be dismissed for failure to satisfy this element, as well.

VI.

Finally, the district court's dismissal of the complaint with prejudice was proper. The Funds argue that even if their complaint cannot survive a Rule 12(b)(6) motion, the district court erred by not giving the Funds leave to amend the complaint. We review "a district court's decision to dismiss a complaint with prejudice for an abuse of discretion." *United States ex rel. Bledsoe v. Comm. Health Sys., Inc.*, 342 F.3d 634, 644 (6th Cir. 2003). The Funds never sought leave to amend before the district court, despite ample opportunity to do so. *See* Fed. R. Civ. P. 15(a)(1) ("A party may amend its pleading once as a matter of course" within twenty-one days of receiving a motion to dismiss for failure to state a claim); *id.* 15(a)(2) ("The [district] court should freely give leave when justice so requires" if the plaintiff does not take advantage of opportunities to amend the complaint as of right); *Morse v. McWhorter*, 290 F.3d 795, 799 (6th Cir.

2002) (acknowledging that a party may amend its complaint after entry of final judgment by "first moving to alter, set aside or vacate judgment"). And our default rule is that "if a party does not file a motion to amend or a proposed amended complaint" in the district court, "it is not an abuse of discretion for the district court to dismiss the claims with prejudice." *CNH Am. LLC v. UAW*, 645 F.3d 785, 795 (6th Cir. 2011).

There is no reason to deviate from that rule here. The Funds rely upon *Bledsoe*, where we concluded that the district court's entry of judgment with prejudice without permitting an amended complaint was improper, despite the plaintiff's failure to file a motion to amend. *Bledsoe*, 342 F.3d at 644–45. But *Bledsoe* was an unusual case because the district court's final order gave plaintiff notice, for the first time, that a heightened pleading standard applied to his claims. *Id.* There was no evidence in the record of "undue delay, bad faith or dilatory motive" on the plaintiff's part, and the plaintiff's disclosures to the government prior to filing his *qui tam* suit showed that he could meet the heightened pleading standard. *Id.* By contrast, in this case, there are no extenuating circumstances justifying a departure from the principle that "it is not the district court's role to initiate amendments." *Total Benefits Planning Agency, Inc. v. Anthem Blue Cross & Blue Shield*, 552 F.3d 430, 438 (6th Cir. 2008). The Funds' claims fail as a matter of law under established pleading standards. Accordingly, the district court did not abuse its discretion in dismissing the complaint with prejudice.

VII.

For the foregoing reasons, we affirm the judgment of the district court.